# Tucker *v.* Mobile Infirmary Association.

## *Damages for Negligent Treatment.*

(Decided February 11, 1915. 68 South. 4.)

1. *Charities; Negligence; Form of Action; Tort or Contract.*—A charitable hospital corporation without stock or stockholders and not operated for profit, treating the indigent freely, and requiring and receiving pay from patients able to pay, and using the money so received in its work, as to a patient injured by the negligence of a nurse employed by it, in whose selection and retention it exercised due care, and of whose incompetence it had no notice, though it exercised reasonable care with respect to the competency of the nurses, is subject to the same liability, whether the injury is declared to be a breach of an express contract, or of a contract implied by law.

2. *Same; Tort; Trust Fund; Theory.*—If there is any exemption to a charitable hospital from liability for negligent injury to a patient, it cannot rest on the theory that its funds are held in trust for its particular charitable purposes, and that it would be a breach of trust to apply them to any other purpose, and that the payment of damages resulting from the negligence of its employees is not a purpose contemplated by the trust.

3. *Same; Respondeat Superior.*—If there is any exemption to a charitable hospital from liability for injuries to a patient, it cannot rest on the theory that the rule of respondeat superior does not apply to such institutions for the reason that its servants in the exercise of their duties are not engaged in work which is for the profit of the corporation.

4. *Same; Injury to Patient; Implied Assent.*—A hospital treating indigent patients without cost, but requiring and receiving pay from patients able to pay, which had issued no stock and had no stockholders, and which was not operated for profit, but used the money received from pay patients in the operation and extension of its hospital work, and exercised due care in the selection and retention of a nurse, and as to her competency, and did not know of her incompetency, was not exempt from liability for damages to a patient there for surgical operation, and who paid a reasonable compensation, and who, after the operation, was scalded internally and externally by reason of the negligence of a nurse; such patient in such a case, not impliedly assenting to and assuming the risk of such negligent injury, nor waiving the corporation's liability therefor.

5. *Evidence; Judicial Notice; Charitable Corporation.*—The court may take judicial notice of the fact that many of the most noted institutions for the treatment of the sick were established by endowment, are not operated for profit, accept charity patients, and are such as come within the definition laid down in the books as charitable institutions.

(Mayfield, J., dissents.)

[Tucker v. Mobile Infirmary Association.]

APPEAL from Mobile Circuit Court.

Heard before Hon. SAMUEL B. BROWNE.

Action by Fannie Tucker against the Mobile Infirmary Association for damages for personal injury while being treated at said institution. Judgment for defendant on the pleadings, and plaintiff takes nonsuit, and brings this appeal. Reversed and remanded.

The following is the complaint: Count 1. Plaintiff claims of defendant  *   *   *  as damages for that heretofore, to wit,  *   *   *  defendant was in the business of conducting an infirmary for the treatment of patients requiring operations and other medical treatment, and for a reasonable compensation, defendant undertook and promised to properly nurse and care for plaintiff, preparatory to and during a surgical operation which she then required, and thereafter until she had sufficiently recovered to leave the institution, and that while plaintiff was so in said infirmary for such treatment, and after she had been operated on for some trouble of the internal organs, plaintiff was badly scalded with boiling water both internally and externally by reason of the negligence of one of the nurses employed by defendant in the care of plaintiff, and while said nurse was engaged in and about the duties of her employment.

The second count is the same as the first down to and including the words "both internally and externally," and adds, "by reason of the said defendant's negligently intrusting the care of plaintiff while she was under an anæsthetic to an incompetent nurse."

The following are the pleas in the case: (2) To each count of the complaint defendant says that, at the time when plaintiff claims to have been injured in the manner alleged in her complaint, defendant was an institution operated exclusively for charity, and that due care was exercised by defendant in the selection and

retention of the service of the nurse referred to in the complaint. (3) At the time when plaintiff alleges that she suffered the injuries described in her complaint, defendant was engaged in the business of conducting a charitable hospital; that the ministrations of said hospital were not confined exclusively to the indigent, but pay was required and received from such patients as were able to pay for the services, attentions and accommodations furnished them; that defendant corporation has issued no stock and has no stockholders; that it is not operated for profit, and never has been; that as moneys are earned by defendant they are and will be applied exclusively to the operations of its hospital, payment of its debts, and the extension of its work as a charity institution; that defendant exercised due care in the selection and retention of the nurse referred to in said complaint, and, if said nurse was incompetent, such fact was not known to defendant, and defendant had no notice thereof, although defendant exercised reasonable care with regard to the competency of said nurse.

GREGORY L. & H. T. SMITH, and WILLIAM G. CAFFEY, for appellant.

C. J. TORREY, and WEBB & McALPINE, for appellee.

GARDNER, J.—Plaintiff (appellant here) brought this suit against the Mobile Infirmary Association for the recovery of damages alleged to have been sustained by being scalded with boiling water both internally and externally as a result of the negligence of one of the nurses employed by defendant in care of the plaintiff, and while such nurse was engaged in the duties of said employment. There were two counts in the complaint.

The reporter will set out counts 1 and 2 and pleas 2 and 3 in his report of the case. Demurrers to these pleas were overruled and replications were filed. Plaintiff took nonsuit on account of adverse rulings on the pleadings and brings the case here for review.

We think the pleas to the two counts ordered to be set out will be sufficient to present the question raised by the record.

Each of the counts alleged that for a reasonable compensation the defendant undertook and promised to properly nurse and care for plaintiff preparatory to and during a surgical operation and thereafter until she had sufficiently recovered to leave the institution.

In the first count the injuries are alleged to have been the result of negligence of one of the nurses employed by the defendant in care of the plaintiff, and in the second count as a result of defendant's negligently intrusting the care of the plaintiff, while under an anæsthetic, to an incompetent nurse.

It is insisted by counsel for appellant in brief that the complaint is one for damages for the breach of a contract, citing *Western Union Telegraph Co. v. Littleton,* 169 Ala. 99, 53 South. 97; *McDaniel v. Johnson,* 110 Ala. 526, 19 South. 35; *Mott v. Jackson,* 172 Ala. 448, 55 South. 528. In the case first cited, quoting from the case of *Wilkinson v. Moseley,* 18 Ala. 288, it was said: "If the cause of action, as stated in the declaration, arises from a breach of promise, the action is ex contractu; but if the cause of action arises from a breach of duty, growing out of the contract, it is in form ex delicto and case."

The opinion in *Western Union Telegraph Co. v. Littleton, supra,* also makes note of the fact that it has frequently been said that it is often difficult to determine

whether a count is on the contract or in tort, and regret is expressed that such is the case.

In each count of the complaint as above shown, the expressed promise and undertaking for a reasonable compensation to properly nurse and care for the plaintiff is alleged, and it is insisted therefore that the cause of action is shown to arise from the breach of this promise, and therefore that the action is ex contractu. However, this we need not determine, as we do not deem it material for the reasons which will hereafter be stated.

It is insisted that, the action being ex contractu, the cases of *Ward v. St. Vincent's Hospital,* 39 App. Div. 624, 57 N. Y. Supp. 784, and *Armstrong v. Wesley Hospital,* 170 Ill. App. 81, are authorities to support the cause of action as for the breach of an expressed contract resulting in injury to the patient. It must be conceded, if the counts are so construed, that such seems to be the effect of these decisions.

(1) From the view we take of the case, it is also unnecessary that this be determined, as we are in accord with the following quotation from the case of *Duncan v. St. Luke Hospital,* 113 App. Div. 68, 98 N. Y. Supp. 867, found recited in *Duncan v. Nebraska Sanitarium Association,* 92 Neb. 162, 137 N. W. 1120, 41 L. R. A. (N. S.) 973, Ann. Cas. 1913E, 1127: "Nor can we see any reason why there should be any difference in the rule where the tortious act which caused death is alleged to be a breach of an expressed contract than where it is alleged to be a breach of an implied contract, or where no contractual relation at all existed."

We are therefore of the opinion that, in so far as this case is concerned, the rule of liability would be the same whether an expressed contract were alleged or merely one implied by law.

That the complaint upon its face, in ordinary cases, shows a right of action in the plaintiff against the defendant, is, as we view the pleadings, practically conceded. The defendant, as shown more fully by plea 3, seeks exemption from liability because of the fact that it was engaged in the business of conducting a charitable hospital, that the corporation issued no stock, has no stockholders, is not operated for profit, and that while its ministrations were not confined exclusively to the indigent, and pay was required and received from such patients as were able to pay for the service, yet the moneys earned by the corporation were applied exclusively in the operation of its hospital, payment of its debts, and the extension of its work as a charitable institution; and it is then averred that the defendant exercised due care in the selection and retention of the nurse referred to in the complaint. In short, the defense is that, having exercised due care in the selection and retention of the nurse, the defendant is exempt from all liability to the plaintiff, because of the fact that it is an institution organized, not for profit, but for charitable purposes.

The question presented is one of much interest, and a subject upon which much appears to have been written in recent years. It must be conceded at the outset that the great weight of authority in this country, certainly from a numerical standpoint, lies with the defendant in this case. It appears, however, to be conceded by counsel, and we have found nothing to the contrary, that the question is an open one in this state, leaving us free to act without any constraint of the rule of stare decisis, and in accordance with what we deem to be the law.

Among the early cases in this country deciding such charitable institutions exempt from liability to the pa-

tient is that of *McDonald v. Mass. General Hospital,* 120 Mass. 432, 21 Am. Rep. 529; and it has been frequently cited and approved in subsequent cases in that jurisdiction.—*Farrigan v. Puryear,* 193 Mass. 147, 78 N. E. 855, 7 L. R. A. (N. S.) 481, 118 Am. St. Rep. 484, 8 Ann. Cas. 1109; *Thornton v. Franklin Square House,* 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 486.

The above case of *McDonald v. Mass. General Hospital* has been frequently cited and followed in other jurisdictions, and we therefore think it important, at the outset to call attention to what seems to be the only authority relied upon in that opinion upon the question here under consideration—that of the English court in the case of *Halliday v. St. Leonard,* 11 C. B. (N. S.) 192, decided by the Court of Common Bench in 1861.

It is clear, however, that in the subsequent case of *Mersey Docks v. Gibbs,* Law Rep. 1 H. L. 93 (11 H. L. 686), the principle of *Halliday v. St. Leonard, supra,* was not followed, but that in effect that authority was overruled. The principal opinion in the case of *Mersey Docks v. Gibbs* was written by Mr. Justice Blackburn, and he was also the writer of the opinion in the case of *Foreman v. Castlebury Court of Queen's Bench,* Law. Rep. 1870-71, 214, wherein, speaking of the said case of *Halliday v. St. Leonard,* it is said in the opinion as follows: "Upon looking at the facts of that case it would appear that it would have been the authority directly in point for the present defendants if the case was still an authority at all; but, upon looking at the reason of that decision, we consider it to be overruled by the decision of the House of Lords in the case of *Mersey Docks v. Gibbs,* L. R. 1 H. L. 93. It is not overruled by name, but the principle upon which that

case was decided in the House of Lords does overrule it. * * *"

It is therefore made clearly to appear that the English authority relied upon in the case of *McDonald v. Mass. General Hospital, supra,* had been in effect, and, so far as the principle announced therein is concerned, overruled in the case of *Mersey Docks v. Gibbs, supra,* and this is expressly stated in the case of *Foreman v. Canterbury, supra,* by Justice Blackburn, who was also the author of the opinion in the *Mersey Docks Case.* This is significant to be here noted because of the face that the *McDonald Case* seems to be among the early cases treating the question in this country. It seems to have been largely followed by other jurisdictions. The *McDonald Case* was decided in 1876, and the decision in the *Mersey Docks Case* antedates the *McDonald Case* some several years, as well also, it appears, does the *Foreman Case, supra.* This does not seem to have been taken note of or called to the attention of the Massachusetts court in the *McDonald Case.*

As said by the Supreme Court of Rhode Island in the case of *Glavin v. Rhode Island Hospital,* 12 R. I. 411, 34 Am. Rep. 675: "The authority of *McDonald v. Mass. Gen. Hospital,* in so far as it rests upon *Halliday v. St. Leonard,* is seriously impaired by these cases. * * *"

That the *McDonald Case* was rested upon the English authority which had been overruled is noted in a very recent English case (*Hillyer v. Governors of St. Bartholomew's Hospital,* Law Reports 1909, 2 K. B. 820), wherein Kennedy, L. J., uses this language: "With the American and New Zealand cases which were cited to us by the learned counsel on both sides I do not think it necessary to deal. They are not in

agreement; in one of them, *McDonald v. Mass. Gen. Hospital,* relied upon by the defendants, the judgment appears to have been influenced by an English decision of *Halliday v. St. Leonard,* Shoreditch (3), which has been overruled by the House of Lords, in *Mersey Docks, Trustees, v. Gibbs.* See per Blackburn, J., in *Foreman v. Mayor of Canterbury.*"

The importance of directing attention to this situation at this time is further emphasized when we note the fact that the *McDonald Case* has been considered a leading case, if indeed not the pioneer case upon this particular question in this country and been followed, cited, and quoted from in many subsequent decisions. It is said to be a leading case in the note to 6 Cyc. 975, and in *Taylor v. Hospital,* 85 Ohio St. 90, 96 N. E. 1089, 39 L. R. A. (N. S.) 427, quoting from another, it is said: "The doctrine of the Massachusetts cases may be said to be the law followed by other states. *      *      *"*

The *McDonald Case* is cited and commented upon in *Glavin v. R. I. Hospital,* 12 R. I. 411, 34 Am. Rep. 675, and in the concurring opinion of Justice Potter we find the following remark: "The arguments of counsel have been very able, but their researches have only discovered one case nearly in point, *McDonald v. Mass. Hospital,* 120 Mass. 432 [21 Am. Rep. 529]."

It is further indicated in the opinion of *Hearns v. Waterbury Hospital,* 66 Conn. 98, 33 Atl. 595, 31 L. R. A. 224, that the *McDonald Case* was among the earliest in this country dealing with this question. The opinion states that the first case to which the attention of the court had been called was that of *Richmond v. Long,* 17 Grat. 375, 94 Am. Dec. 461, decided in Virginia; but it is further shown that liability was denied in that case, on the ground that the management of

the hospital was under governmental powers, under the laws of Virginia, and that in fact the government was the principal or master. Such a case as the Virginia case is of the character as that decided by our own court in the case of *White v. Alabama Insane Hospital*, 138 Ala. 479, 35 South. 454, where the corporation was held to be only an arm or agency of the state, and cases of this character, therefore, are without application to the question we have at hand. Some of the decisions make note of the point that many of the cases could have been decided upon this doctrine. It is therefore clear that the *McDonald Case* is among the earliest, if not the first, in this country which is directly in point.

While it must be conceded that the great weight of authority in this country is in favor of exemption to an institution engaged in charitable work from liabilty for the torts of its servants or agents, yet there is some contrariety of opinion as to the principles upon which this result is rested, and varied reasons are given, not at all consistent one with the other. For the purposes of this case these authorities may be grouped into three classes. One line of decisions would rest exemption from liability upon what might be termed "the trust fund theory," that is, that all funds of such institutions are held in trust for the particular charitable purpose, and that it is a breach of trust to apply them to any other purpose, and that the payment of damages due to the negligence of the servants of the institution is not a purpose contemplated by the trust, and that therefore their funds cannot be diverted to the payment thereof. Other authorities rest their conclusion, it seems, upon the theory that the rule of respondeat superior does not apply to such institutions for the reason that the servants in the exercise of their

duties are not engaged in the work which is for the benefit of the master, and that such is essential to call for the application of this rule. Still other authorities base their conclusion upon what might be termed an "implied assent theory;" that is, that one who accepts the benefit of charity must be taken impliedly to have assumed the risk of negligent injuries caused to him by servants who have been properly employed or retained in this service, or to have waived liability of a charitable institution for injuries so received.

We will briefly note these three theories, taking them up in the order just named. A detail treatment, however, of each of the authorities relied upon would cause this opinion to be of undue length, and we will content ourselves with as brief a review as is practicable, citing some of the authorities whereby the reader, if interested, may pursue a thorough research.

The "trust fund theory," as we have above termed it, rests, as previously stated, upon the reasoning that, as the funds are held in trust for a particular charitable purpose, it is a breach of that trust to apply them to any other purpose, and therefore the payment of damages occasioned by the torts of the servants or agents of such institution would result in a diversion of such trust funds. Followed to its logical conclusion, this theory would result in absolute immunity from damages of any character being recovered against such institution, which would exempt them from liability of the servant to the patient, and to a third person, and indeed it would seem to also exempt them from damages from the breach of an expressed contract. The doctrine, we think, it clearly appears, can find no support in the English authorities. In the case of *Mersey Docks v. Gibbs, supra,* the corporation acted as a trustee for and collected tolls for the use of the docks, acted

without reward to itself, and the tolls or receipts were not applicable to the use of the corporation, but were devoted to the maintenance of the works, and in case of any surplus the toll rate was to be proportionately diminished. Here was a trust service for the public benefit, without reward and without expectation of profit on the part of those performing the service. In the opinion Mr. Justice Blackburn says: "Now, it is obvious that a shopowner who pays dock rates for the use of the dock, or the owner of goods who pays warehouse rates for the use of a warehouse and the service of the warehousemen is, as far as he is concerned, exactly in the same position, however the rates may be apportioned. He pays the rates for the dock accommodation, or for warehouse accommodation and services, and he is entitled to expect that reasonable care should be taken that he shall not be exposed to danger in using the accommodation for which he has paid."

(2) In the cases of *Powers v. Mass. Homeopathic Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372, and *Bruce v. Central Methodist Episcopal Church,* 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150, the English authorities upon this question are given some review, and we think demonstrate clearly that what we here term the "trust fund theory" finds no support in the English jurisprudence of this time. As said in the *Powers Case, supra*: "Whatever may be the limit of the liability of a political or municipal body in Great Britain for the torts of its servants, that limit is now in no way determined by any doctrine concerning the application of a trust fund."

In the recent case of *Basabo v. Salvation Army,* 35 R. I. 22, 85 Atl. 120, 42 L. R. A. (N. S.) 1144, may be found a careful review of the authorities upon this ques-

tion and a classification of them. The opinion points out many of the cases holding to the "trust fund theory" to such an extent as would create absolute immunity, and then other cases which, while apparently holding to the same trust fund theory, limit this exemption to cases where there was no negligence in the selection or retention of the servants. It is unnecessary that we here cite these cases, as they are set out in the *Basabo Case* to which we are now referring. In speaking of these two classes of cases the opinion says: "We think these latter cases must be regarded as entirely inconsistent with the general proposition of the exemption of charitable corporations on grounds of public policy set forth in the previous cases, as was said in reference to many of these cases by Gaynor, J., in *Kellogg v. Church Charity Foundation,* 128 App. Div. 214, at page 217, 112 N. Y. Supp. 566, at page 569: 'In many if not most, of the cases, a ground for the nonliability for the torts of agents or servants of charitable institutions is that to pay damages for such torts would be a diversion of their funds from the trust purposes for which they are donated by the charitable, and thus a contravention of the trust, and that as such institutions have no other funds it would be futile to allow judgments to be taken against them in such cases. But the opinions of the judges in these same cases almost invariably except cases where the agent or servant was incompetent and there was negligence in his selection; failing to take note that it would be as much a diversion of the trust funds to pay damages for the tort of negligence in selection as for any other tort. If the rule exist, it must necessarily apply to all torts and in all cases. The only support for the argument that it does exist is found in the remarks of judges in certain rather old English cases, which were repudiated in later

cases, and never had a direct application to actions of tort against charitable corporations such as are now common. It is true that an action does not lie against a trustee under a will, or the like, as such, for his torts or those of his servants in the affairs or administration of a trust He has to be sued individually; but the reason is purely technical, and the courts allow the judgment against him individually for damages to be paid out of the trust funds, if he was free from willful misconduct in the tort. No rule therefore that trust funds may not be used to pay damages for torts in the administration of the trust exists even in the case of ordinary express trusts, let alone in the general trusts of charitable corporations.—*Powers v. Mass. Homeopathic Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372; *Bruce v. Central Methodist Ep. Church,* 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150; *Hewett v. Woman's Hospital Aid Ass'n,* 73 N. H. 556, 64 Atl. 190, 7 L. R. A. (N. S.) 496. * * * These views were approved by the Court of Appeals of New York (although the decision was reversed on other grounds) in *Kellogg v. Church Charity Foundation,* 203 N. Y. 191, 194, 96 N. E. 406, 38 L. R. A. (N. S.) 481, Ann. Cas. 1913A, 883."

We are of the opinion that the doctrine of the absolute exemption of charitable corporations is very much weakened by the position taken by the courts in these later citations, and is practically repudiated by them, whatever general remarks the courts may have made in regard thereto, when the same are submitted to a careful and logical consideration.

The case of *Downes v. Harper Hospital,* 101 Mich. 555, 60 N. W. 42, 25 L. R. A. 602, 45 Am. St. Rep. 427, has been frequently cited by other courts in support of this trust fund theory, and it is difficult for one giving

this case a careful reading and noting the authorities relied upon in the opinion to reach any other conclusion than that in fact the case was decided upon that theory. As an illustration of this may be noted the case of *Gable v. Sisters of St. Francis*, 227 Pa. 254, 75 Atl. 1087, 136 Am. St. Rep. 879, where the court lays much stress upon the treatment of this theory in the *Downes Case*. Yet this doctrine is expressly repudiated by the Michigan Supreme Court in the recent case of *Bruce v. Central Methodist Church*, 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 150, in a very able opinion, and in which it was attempted to show that the real theory of the *Downes Case* rested upon an implied assent. In the opinion it is said: "It is equally true that the proposition that trust funds cannot be used to compensate wrongs committed by the agent of the trustee is not a correct statement of the law. * * * The doctrine that the will of an individual shall exempt either persons or property from the operation of general laws is inconsistent with the fundamental idea of government. It permits the will of the subject to nullify the will of the people. Nor can I conceive any ground upon which a court can hold that effect can be given to that will when it relates to property devised or conveyed for the purpose of a charitable trust. Such a holding must rest upon the argument that the advantages reaped by the public from such trusts justify the exemption; that is, as applied to this case, the advantages to the public justify defendant's exemption from liability for wrongs done to individuals. If this argument is sound—and its soundness may be questioned, for there are those who will deny that the advantages to the public justify the wrong to the individual—it should be addressed to the legislative, and not to the judicial, department of the government. It is our duty

as judges to apply the law. We have no authority to create exemptions or to declare immunity."

Discussing the same doctrine, the Supreme Court of New Hampshire, in the case of *Hewett v. Woman's Hospital Ass'n,* 73 N. H. 556, 64 Atl. 190, 7 L. R. A. (N. S.) 486, has this to say: "It would seem to be entirely unnecessarry to discuss a proposition so barren of arguments in its favor. That a charitable institution has certain duties to perform towards those with whom it is associated, which it cannot violate with impunity, in the absence of some express exemption of a legislative character, is not debatable. The sanctity of its general trust fund or property does not make that result necessary or, on grounds of public policy, desirable. The liability of charitable corporations in actions of tort is frequently enforced"—citing authoritties.

In *Kellogg v. Church Charity Foundation,* 203 N. Y. 191, 96 N. E. 406, 38 L. R. A. (N. S.) 481, Ann. Cas. 1913A, 883, the Supreme Court of New York says: "It must now be regarded as settled that a charitable corporation is not exempt from liability for the tort against a stranger, because of the fact that it holds its property in trust to be applied to purposes of charity."

And also in the case of *Horden v. Salvation Army,* 199 N. Y. 233, 92 N. E. 626, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 889, that court, speaking of the same subject, said: "Certainly liability for negligence in the selection of servants may impair the integrity of the trust estate just the same as liability for the negligence of servants, though of course not so frequently."

Concerning this theory, Mr. Labatt, in volume 7 (2d Ed.) of his work on Master and Servant, says: "This doctrine, however, has been repudiated in some of the cases. The difficulty with the impairment of the trust fund theory is that, to apply it consistently, it would

exempt charitable institutions from all liability for negligence whatsoever; whereas, even in cases upholding this theory, some exceptions are made. It is generally assumed that such institutions would be responsible, for example, for negligence in the selection of their servants; but, if nonliability is based on the doctrine that the trust fund must not be impaired, why should there be any distinction in this respect between negligence in the selection of servants and negligence of servants chosen with due care? In either case, if judgment is to be paid out of the trust fund, it is bound to be impaired. The same reasoning would apply to negligence in the care of the buildings, resulting in injury to a patient or to a third person, and negligence, say, of an ambulance driver, causing injury to a third person, and to negligence as to all of those duties which are cast upon masters by law, and which cannot be delegated."

What we have here said, and the authorities which we have cited, we think, are all sufficient to show that the trust fund theory is no solid foundation upon which to rest, and is repudiated in the modern well-considered cases, and even in some of the states (as in the *Downes Case, supra*), where it is supposed to have once been applied.

In the case of *Horden v. Salvation Army,* the opinion written by Chief Justice Cullen cites and gives some brief review of the Massachusetts cases upon this subject. He points out that in the early case of *McDonald v. Mass. General Hospital, supra,* the plaintiff was a gratuitous patient, but a reading of the opinion in that case clearly demonstrates the conclusion was not affected by that fact. We think the brief review of the Massachusetts cases found in the *Horden Case* clearly demonstrates that their decisions cannot be harmon-

ized upon the trust fund theory, and in the opinion it is stated: "Whether since this last decision Massachusetts is to be placed in the class of states adhering to the doctrine of total immunity may well be doubted."

See, also, recent case of *Hospital, etc., v. Thompson* (Va.) 81 S. E. 13, 51 L. R. A. (N. S.) 1025, where several authorities are reviewed.

(3) The second theory relied upon in some of the cases, that the rule of respondeat superior does not apply against such institution for the reason that the servant or agent in the exercise of his duties is not acting for the benefit or profit of the master, needs, we think, but brief consideration.

The rule of respondeat superior was given application in the case of *Mersey Docks v. Gibbs, supra,* and the true principle concerning this rule was stated in the following quotation found in this case: "Upon the principle that qui facit per alium, facit per se, the master is responsible for the acts of his servant; and that person is undoubtedly liable who stood in the relation of master to the wrongdoers, he who had selected him as his servant from the knowledge or belief in his skill and care, and who could remove him for misconduct, and whose orders he was bound to receive and obey."

And, also, it is clearly demonstrated that the rule of respondeat superior is not dependent upon whether the master makes profit by the discharge of the duties in the following quotation from the case of *Gilbert v. Trinity House,* 17 Q. B. D. 795: "The law is plain that whosoever undertakes the performance of, or is bound to perform, duties—whether they are duties imposed by reason of the possession of property, or by the assumption of an office, or however they may arise —is liable for injuries caused by his negligent discharge of those duties. It matters not whether he makes money

or a profit by means of discharging the duties, or whether it be a corporation or an individual who has undertaken to discharge them. It is also immaterial whether the person is guilty of negligence by himself or by his servant, if he elects to perform the duties of his servant. If in the nature of things he is obliged to perform the duties by employing servants, he is responsible for their acts in the same way that he is responsible for his own."

The case of *Hearns v. Waterbury Hospital, supra,* seems to rest largely upon the theory that the rule of respondeat superior does not apply. Many of the English cases are reviewed as well as others, but the opinion is far from convincing.

Speaking of this case, it was said by the writer of the opinion in *Bruce v. Central Methodist Church*: "I think one cannot carefully read the elaborate opinion in the *Hearns Case* and examine the authorities therein cited (see, particularly *Foreman v. Mayor of Canterbury,* L. R. 6 Q. B. 214; *Gilbert v. Trinity House,* L. R. 17 Q. B. Div. 795; *Levingston v. Guardians, etc.,* 2 I. R. c. f. 202; and *Mersey Docks v. Gibbs, supra*) without reaching the conclusion that the doctrine of respondeat superior does apply, though the business is. not carried on for the purpose of profit. I conclude from this reasoning that corporations administering a charitable trust, like all other corporations, are subject to the general laws of the land, and cannot therefore claim exemption from responsibility for the torts. of their agents, unless that claim is based on a contract with the person injured by such a tort, and that *Downes v. Harper Hospital* and other similar cases are consistent with this rule. They rest upon the principle correctly stated in *Powers v. Mass. Homeopathic Hospital, supra,* viz., that the beneficiary of such charit-

[Tucker v. Mobile Infirmary Association.]

able trust enters into a contract whereby he assumes the risk of such torts. It is not surprising that years should have elapsed before the correct legal principle governing these cases was announced in *Powers v. Mass. Homeopathic Hospital.* The discovery of correct legal principles, like the discovery of scientific and social truths, requires time and patient investigation."

The following quotation from *Kellogg v. Church Charity Foundation, supra,* is also directly in point and to the same effect: "In many of the cases much is made of the fact that such institutions derive no profit or benefit, on the question of whether such rule applies, or, indeed, whether they can be held liable for any torts. But that exemption from liability does not arise from that fact is manifest from the undoubted liability of other similar institutions which derive no profit or benefit.—*Rector, etc., of Church of Ascension v. Buckhart,* 3 Hill [N. Y.] 193; *Blaechinska v. Howard Mission, etc.,* 56 Hun, 322 [9 N. Y. Supp. 679]; *Mulchey v. Meth. Rel. Society,* 125 Mass. 487; *Davis v. Central Congregational Society,* 129 Mass. 367 [37 Am. Rep. 368]; *Newcomb v. Boston Protective Department,* 151 Mass. 215 [24 N. E. 39, 6 L. R. A. 778]; *Chapin v. Holyoke Y. M. C. A.,* 165 Mass. 280 [42 N. E. 1130]. * * * The position of such corporation in respect of its torts would seem to be the same as that of an individual carrying on similar charitable work with donated funds or with funds of his own. I do not understand that if my servant, sent out by me on an errand of mercy or charity, negligently runs over one in the street, I am not liable for his act."

We cite in this connection *Gartland v. New York Zoological Society,* 135 App.Div. 163, 120 N. Y. Supp. 24, 29; *Bruce v. Central Methodist Church,* 147 Mich. 230, 110 N. W. 951, 954, 10 L. R. A. (N. S.) 74, 11

Ann. Cas. 150; *Glavin v. R. I. Hospital*, 12 R. I. 411, 34 Am. Rep. 675; *Winch v. Conservators of the Thames*, L. R. 7 C. P. 458, 472; *Mersey Docks v. Gibbs, supra*; Labatt's Master & Servant, vol. 7, p. 7692.

The question, however, we conclude, is foreclosed in this state from the language used in the opinion of *Sou. Ry. v. Wildman*, 119 Ala. 565, 24 South. 764, wherein it is said: "The words 'interest of,' or 'prosecution of business,' naturally would impress the average juror with the idea that the act was not done with the purpose or intent to promote the interest of, or in furtherance of the business of, the employer, and the employer cannot be held liable. Certainly such a rule would restrict the liability of the employer within too narrow a compass."

The basis of the doctrine of respondeat superior in this state is to be found in the maxim, "Qui facit per alium, facit per se." See, also, *Hall Mch. Co. v. Haley Mfg. Co.*, 174 Ala. 197, 56 South. 726; *Cooper v. Slaughter*, 175 Ala. 211, 217, 57 South. 477. We therefore conclude unhesitatingly that exemption from liability cannot be rested upon the theory that the rule of respondeat superior has no application.

We are thus brought by the rule of exclusion to the last stated theory, that of "implied assent." This is the theory upon which the more recent and best considered cases seem to rest.—*Bruce v. Central Methodist Church, supra; Powers v. Mass. Homeopathic Hospital; Kellogg v. Church Charity Foundation; Hordern v. Salvation Army*, 199 N. Y. 233, 92 N. E. 626, 32 L. R. A. (N. S.) 62, 139 Am. St. Rep. 889; *Barsabo v. Salvation Army, supra*.

In the case of *Kellogg v. Church Charity Foundation, supra*, it was said: "If, then, in order to find a ground, we again resort to classification of the cases that have

come into the courts, or that may arise, and separate torts of such servants against beneficiaries or patients of the charitable trust or institution, from torts against outsiders, a ground for such exemption may be perceived in respect of the former, but not of the latter. The law may imply an intention on the part of the donors of the charitable funds that such funds shall be used for the charitable purpose only, and then imply an acquiescence in this intention by all persons who accept the benefits of the charity, and in that way spell out a waiver by such persons of any responsibility of the institution for the negligence or torts of its servants. If the courts want to exempt such institutions, this may be a tenable, though some may think a rather ingenious or far-fetched ground on which to do it. But no such acquiescence or waiver can be attributed to an outsider."

In a very recent case in New York, it is stated that immunity now rests upon two grounds by the decisions: First, upon that of implied waiver; and, second, upon grounds that the relation of master and servant does not exist between the hospital and the physicians and surgeons, and even, in some instances, nurses. See *Schloendorff v. Society of N. Y. Hospital,* 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505.

Some of the cases applying this theory of the implied assent seem to rest largely upon what was said in the opinion by Lowell, District Judge, in the case of *Powers v. Mass. Homeopathic Hospital, supra.* In that case, although the language may be said to be very broad, it should be noted that, although the patient in the hospital was what was termed a "paying patient," yet the opinion shows that the sum paid was, in the opinion of the writer, "of insignificant proportion" to the cost of the services rendered. If this is true, then

it should be borne in mind that, while the patient was what was termed a "paying patient," yet she did not pay or offer to pay reasonable compensation for the services rendered, and clearly that in proportion as the sum paid was insignificant for the services rendered, then it must follow just to that proportion the patient was not a "paying patient," but in truth and in fact a charity patient. As the opinion seems to form a base or foundation for the conclusion of the court in other cases, we think it important that these facts be made prominent and given emphasis. In the opinion it is said: "That a man is sometimes deemed to assume a risk of negligence, so that he cannot sue for damages caused by the negligence, is familiar law: Such is the case at bar. * * * One who accepts the benefit either of a public or a private charity enters into a relation which exempts his benefactor from liability for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men. We cannot perceive that the position of the defendant differs from the case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than

he did, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or by their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected."

In the case of *Bruce v. Central Methodist Church,* it appears from the opinion that a charitable institution cannot claim exemption from responsibility, unless that claim is based on a contract with the person injured by such a tort. Speaking of the *Downes Case,* and others of similar character, the opinion says: "They rest upon the principle correctly stated in *Powers v. Mass. Homeopathic Hospital, supra,* viz., that the beneficiary of such charitable trust enters into a contract whereby he assumes the risk of such torts. It is not surprising that years should have elapsed before the correct legal principle governing these cases was announced in *Powers v. Mass. Homeopathic Hospital.*"

Speaking to this same subject, the Supreme Court of California, in *Thomas v. German Gen. Benevolent Society,* 141 Pac. 1186, has this to say: "A final contention of appellant is that it is in no way responsible, by reason of the fact that it is a charitable institution, and that an action against it such as this will not lie. Such was the doctrine of some of the earlier cases. We need not enter into an elaborate discussion of the question. All of the authorities pro and con have been elaborately collated and learnedly reviewed in *Basabo v. Salvation Army* [35 R. I. 22, 85 Atl. 120], 42 L. R.

A. (N. S.) 1144. With the conclusion there reached we are in accord. That conclusion is that the true doctrine amounts to this: That where one accepts the benefit of a public or of a private charity he exempts by implied contract the benefactor from liability for the negligence of the servants in administering the charity, if the benefactor has used due care in the selection of those servants."

The opinion in the *Powers Case, supra,* clearly shows that it proceeded upon the theory that one who accepts charity either wholly or partially, as it were, assumes the risk of negligence, and this we take it must be held to be the underlying principle of the decision.

(4, 5) If it be conceded (without deciding, as unnecessary at this time) that the principle is logical and well founded, we are of the opinion that it could not be given application in this case as presented by this record. The complaint alleges that the plaintiff agreed to pay a reasonable compensation; that is, such sum as is reasonable to be paid for the services rendered. She has depended upon no charity, she sought none, but was to pay a reasonable price for what she received. Had she been a dependent upon another's bounty, either to a great or small degree, there might be some plausibility in the argument that it would not lie in her mouth to say that the institution should be held to strict accountability for the negligent acts of its servants, in administering the charity which she herself has sought. We are unable to conceive upon what principle the theory of "implied assent" could be applied to one who pays full price and without regard to the nature of the institution from which she receives her service. There can be no valid reason why such a patient, dealing as she does at arm's length with the hospital, should not stand in as favorable position as the

stranger, and yet many of the cases grant relief to the latter and deny it to the former.

The principle, if held to be sound, must rest upon the fact that it is the giving and receiving of charity that creates the exemption, and not the nature of the institution administering it.

We make it clear we pretermit the question as to liability for injury to one who in fact accepts charity in an institution of this character as we have not that case before us. It has been questioned that the implied assent theory would be applicable to even such a case, in the dissenting opinion of Justice Fraser in *Lindler v. Columbia Hospital,* 98 S. C. 25, 81 S. E. 512, wherein, speaking to that question and of some of the cases so holding, he says: "We are told, in effect, that a patient entirely unskilled in legal principles, his body racked with pain, his mind distorted with fever, is held to know, by intuition, the principle of law that the courts after years of travail have at last produced. We cannot accept a rule based upon after-discovered reasons. We confess that it is a new doctrine to us that a court will assume an implied contract to relieve against liability for future negligence."

By quoting the above we do not indicate any approval thereof nor otherwise, but merely make note of the same to show that even in such instances the theory has been questioned. We pass that question by until it arises. "Sufficient unto the day is the evil thereof."

We are aware of the fact that the opinion in the case of *Duncan v. Nebraska Sanatarium,* 92 Neb. 162, 137 N. W. 1120, 41 L. R. A. (N. S.) 973, Ann. Cas. 1913E. 1127, would seem to indicate an extension of the principle of the "implied assent theory" to those who were not in fact in any sense recipients of charity, but who paid full compensation for the services rendered. The

opinion says, however, that full compensation was not paid in that case, but a reduced rate was paid and accepted. If this were the case, it may be that the decision might be brought within the *Powers Case, supra,* where in fact charity in part was received by the patient, and, if so, some of the language used may be declared dictum; but whether so or not we are unable to see the force of the reasoning and cannot follow it. Speaking of cases of this character, Justice Fraser, in the above opinion, says: "Some of the cases hold that the pay patients, when they enter a hospital with a charitable foundation, are really charity patients, and the weekly sums they are required to pay are not payments at all, but contributions to the charity funds. This is brilliant, but is not convincing. We think the first duty of every man and the first call upon every fund is to repair the evil of its own doing, and then the remaining fund or remaining strength may be devoted to charity."

It is a principle of law, as well as morals, that men must be just before they are generous. It is a well-known fact, of which courts may take judicial notice, that many of the most noted institutions of this country for the treatment of the sick were established by endowments, are not operated for profit, accept charity patients, and are such as come within the definition of charitable institutions laid down in the books. We are unable to see upon which line of reasoning one who is willing to pay, and does pay, full price for services to be rendered, should be held to have exempted the institution from all liability merely because it is not operated for profit.

With that the patient is not concerned, nor indeed, is he in any mood or condition to inquire. He is seeking restoration to health. He expects to pay the full

price, and can it be said with any show of reason that, because forsooth the money which he pays is not to be paid out as dividends or profits, he lays himself liable to injury by the negligence of those in whose charge he places. himself, or even it may be—and the doctrine followed to its ultimate conclusion would logically so lead—to the willful or wanton wrongful conduct of the servants in charge of the institution. We think not, clearly. The conclusion we have reached is supported in principle by the case of *Glavin v. R. I. Hospital*, 12 R. I. 411, 34 Am. Rep. 675. In that case negligence relied upon was that of an interne in the hospital. The opinion seems to make some distinction as to liability of the hospital for the negligence of physicians and surgeons attendant on it, upon the idea that they are in the exercise of skill and cannot, in a strict sense, be considered servants or agents of the hospital, and consequently are not subject to be controlled by the hospital. See, also, *Basabo v. Salvation Army, supra*; 5 Ruling Case Law, § 121. With this distinction, however, we are not here concerned, as the negligence relied upon was that of a nurse, and in regard to a matter which it does not appear would require any peculiar skill or knowledge, and indeed no such defense is here attempted to be set up in any of the pleadings. We therefore find no necessity for a discussion of any such distinction. In the *Glavin Case* it was said: "The argument is that hospitals, like the Rhode Island Hospital, are a public benefit; but if they are liable for the torts of the physicians or surgeons attendant on them, or of the medical or surgical interns, or of their nurses and other servants, people will be discouraged from voluntarily contributing to their foundation and support, and therefore public policy demands that they shall be exempted from liability. In our opinion the

argument will not bear examination. The public is doubtless interested in the maintenance of a great public charity, such as the Rhode Island Hospital is; but it also has an interest in obliging every person and corporation which undertakes the performance of a duty to perform it carefully, and to that extent, therefore, it has an interest against exempting any such person and any such corporation from liability for its negligences. The court cannot undertake to say that the former interest is so supreme that the latter must be sacrificed to it. Whether it shall be or not is not a question for the court, but for the Legislature."

Other cases supporting in principle the conclusion we here reach are: *McInerny v. St. Luke's Hospital*, 122 Minn. 10, 141 N. W. 837, 46 L. R. A. (N. S.) 548; *Armendarez v. Hotel Dieu* (Tex. Civ. App.) 145 S. W. 1030; *Donaldson v. General Public Hospital*, 30 N. B. 279; *Hewett v. Woman's Hospital*, 73 N. H. 556, 64 Atl. 190, 7 L. R. A. (N. S.) 496. In this latter case it is said: "In conducting the affairs of a hospital, its officers and agents are as liable to commit acts of negligence as are the officers and agents of a railroad or other business corporation. Men in general are not uniformly careful. Experience shows that negligence—the failure to exercise ordinary care—is to be expected when men engage in industrial pursuits. It may, not inappropriately, be said to be necessarily incidental in the accomplishment of most practical results through the agency of man. The donors of the defendant's property for hospital purposes were not ignorant of this fact, and are presumed to have given the trust property knowing that it might be required for the liquidation of claims in tort, as well as for claims in contract, incurred in carrying out the purposes of the corporation. Indeed, its conceded authority to contract for the em-

[Tucker v. Mobile Infirmary Association.]

ployment of nurses and other necessary agents would seem to include power to respond in damages for all breaches of such contracts, one essential or incidental element of which is its duty to  *  *  *  pay the stip-. ulated compensation."

We have cited *Armendarez v. Hotel Dieu, supra,* as some of the reasoning appears to support the principle of this opinion, though we are aware that in the recent case of *St. Paul's Sanatorium v. Williamson,* (Tex. Civ. App.), 164 S. W. 36, the rule is stated to be in that state, as to the question directly here at issue, in accord with contention of the appellee.

As previously stated in this opinion, we recognize that the weight of authority in this country is opposed to the conclusion we have here reached. This within itself is, of course, of much force, and has led us to a very careful review of the cases, and a consideration of the principles upon which they may be said to rest. But it sometimes happens that in order to reach a safe harbor one must row against the current. We have here endeavored to show that the theory upon which those cases are founded does not measure with the rule of reason or sound logic, as we view it. While many of them reach the same end, yet they do so by entirely divergent routes and upon theories entirely inconsistent one with the other. For these courts we have the highest respect, but we cannot follow in their wake.

In the *Powers Case, supra,* the writer of the opinion said: "Though we feel constrained to differ from the reasoning followed by some other courts in reaching the same conclusion, we are not unmindful that the identity of conclusion reached, though by different roads, is the strong proof of its correctness. Doubtless a weight of authority is more overwhelming if it is iden-

tical in reasoning as well as in result, but identity of result is in itself no mean argument for its justice."

Generally speaking, the language of the writer may be accepted as correct; but in this particular instance, upon this interesting subject the different views are so divergent and so inconsistent that in our minds the weight of authority has lost its force, and we are rather impressed by a reading of the decisions that the courts holding to the majority view have been rather straining at legal principles in order to reach what they seem to think a desirable and just result. With the result the court cannot feel concerned. It is not for this court to create exemptions or declare immunity from liability in a case of this character as shown by this record, and, if considered to be so violently opposed to the public good, it is a matter that may be addressed to the legislative department. Some of the authorities express a doubt that the advantages to the public would justify a wrong to an individual, thus placing the institution above the law, as it were. But, however this may be viewed, we think the following observation made by Justice Potter in the *Glavin Case, supra,* is most pertinent here: "Is it not better and safer for the court to follow out the analogies of the law, and then, if the Legislature is of opinion that public policy demands a limitation of this liability, it is in its power to interfere and grant an entire or a partial exemption."

It is ours to declare the law as we see it, and, being unable to find a sound legal principle upon which exemption from liability may rest in a case as disclosed by this record, we conclude that pleas 2 and 3, merely in this respect setting up due care in selection and retention in service of the nurse, do not shown a defense to the cause of action, and the demurrer thereto should have been sustained. The judgment of the court below

is reversed, and the cause is remanded to be proceeded with in accordance with the views expressed in this opinion.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN, SAYRE, SOMER-VILLE, and THOMAS, JJ., concur. MAYFIELD, J., dissents.

MAYFIELD, J. (Dissenting.)—If the law is as it is here decided to be, is it not strange that no text-book writer in England or America has ever been able to learn it? It does seem that such judges and text-book writers as Cooley, Kent, Story, Parsons, Shaw, Gibson, Beasley, Bush, Morawetz, Jaggard, and others of equal note, would have found it out, and not have misled the world-litigants and world-courts for a century or more. Is it possible that one decision of one court of the smallest state in the Union contains more wisdom than all other courts, and all text-writers on the subject? There is no decision of any American court, nor opinion of any writer, in accord with the decision of this case, that does not base the opinion on the Rhode Island case cited in this opinion. It has been criticized scores if not hundreds of times, where it has been approved or followed once. One of the greatest courts in the United States, that of Pennsylvania, has spoken as follows: "I will not consume time by discussing the case of *Glavin v. Rhode Island Hospital,* 12 R. I. 411 [34 Am. Rep. 645], which to some extent sustains the opposite view of this question. There a hospital patient paying $8 per week for his board and medical attendance was allowed to recover a verdict against the hospital for unskillful treatment, and it was held that the general trust funds of a charitable corporation are liable to satisfy a judgment in tort recovered against it

for the negligence of its officers or agents. It is at least doubtful whether, under its facts, the case applies; and, if it does, we would not be disposed to follow it in the face of the overwhelming weight of authority the other way, and of the sound reasoning by which it is supported."—*Fire Ins. Patrol v. Boyd,* 120 Pa. 650, 15 Atl. 558, 1 L. R. A. 422, 6 Am. St. Rep. 754.

If the decision of this case is to stand as the law of this state, it cries loudly for the Legislature of Alabama to do what the Legislature of Rhode Island did —put the law of that state in line with that of all the other states by a statute. I ask the question: Should we follow the court of Rhode Island, when the decision of that court was deemed so bad by the people that they rid themselves of it by an express statute?

Judge Paxson, of the Pennsylvania court, speaking for the whole court, well expressed the law, according to my view, on the subject of respondeat superior, and I adopt his words: "That doctrine is, at best, as I once before observed, a hard rule. I trust and believe it will never be extended to the sweeping away of public charities—to the misapplication of funds specially contributed for a public charitable purpose to objects not contemplated by the donors. I think it may be safely assumed that private trustees, having the control of money contributed for a specific charity, could not, in case of a tort committed by one of their number, apply the funds in their hands to the payment of a judgment recovered therefor. A public charity, whether incorporated or not, is but a trustee, and is bound to apply its funds in furtherance of the charity, and not otherwise. This doctrine is hoary with antiquity, and prevails alike in this country and in England, where it originated as early as the reign of Edward V, when it was announced in the Year Book of

that period."—*Fire Insurance Patrol v. Boyd,* 120 Pa. 647, 15 Atl. 557, 1 L. R. A. 417, 421, 6 Am. St. Rep. 752.

Judge Cooley, speaking of the same rule, says: "But this rule does not apply to a purely charitable corporation, having no capital stock and whose members receive no dividends or profits from its operations, and such a corporation is not liable for the torts or neglects of its servants in the performance of their duties. The officer of a public corporation in the discharge of the proper duties of his office is not, in general, to be deemed the servant of the corporation; neither is any person who is employed in any capacity in the execution of its police regulations, or in its fire department. But in the management of its own property a public corporation comes under the same rules with all others, and its agents are its servants.—2 Cooley on Torts, pp. 1011- 1013. .

In a note to this text (pages 1011, 1012) he quotes from the Connecticut court as follows: "We think the law does not justify such an extension of the rule of respondeat superior. It is perhaps immaterial whether we say that public policy, which supports the doctrine of respondeat superior, does not justify such extension of the rule; or say that the public policy which encourages enterprises for charitable purposes requires exemption from the operation of a rule based on legal fiction, and which as applied to the owners of such enterprises, is clearly opposed to substantial justice. It is enough that a charitable corporation like the defendant—whatever may be the principle that controls its liability for corporate neglect in the performance of a corporate duty—is not liable, on grounds of public policy, for injuries caused by personal wrongful neglect in the performance of his duty by a servant whom it has selected with due care; but in such case

[Tucker v. Mobile Infirmary Association.]

the servant is alone responsible for his own wrong.— *Hernes v. Waterbury Hospital,* 66 Conn. 98, 126, 33 Atl. 595, 31 L. R. A. 224."

Mr. Jaggard, in his work on Torts, states the law as follows: "Where a corporation, not municipal or quasi municipal, is engaged in public work: (a) Liability is determined by the rules applying to private corporations, whenever such works are operated for profit; and (b) its exemption is limited by rules as to municipal corporations, when it is a public charity." —Volume 1, p. 184.

Then, after reviewing and citing many decisions and text-books, he concludes as follows: "Following *Halliday v. St. Leonard,* it was held in Massachusetts that a corporation established for the maintenance of a public charity is not liable for injury caused by its servants, if it exercises due care in their selection. In a later decision the responsibility of public charity is determined upon a more logical principle—that where the charity is performing a purely public duty, without profit, it is 'no more liable for the negligence of officers and agents than the city would be.' The reason for this better opinion is stated in *Fire Ins. Patrol v. Boyd,* by Mr. Justice Paxson, 'that, when a public corporation has no property or funds but what have been contributed for a special charitable purpose, it would be against all law and all equity to apply the trust funds thus contributed to compensate injuries inflicted by the negligence of its agents and servants.' This is the generally recognized rule."—1 Jag. on Torts, p. 187.

The same doctrine is stated in Cyc. and in American & English Encyclopædia of Law.

The whole doctrine of respondeat superior is at best a very, very harsh one; it makes one person answer for the sins of another. The law has wisely limited the

doctrine to cases in which the superior has a private or pecuniary interest in the sin or wrong committed by the other or inferior. It has never been extended, and never should be extended, to cases in which the superior has no private or pecuniary interest in the wrongful act. If the superior is acting for the public, and his acts are righteous and charitable, surely he ought not to be held liable for the sins of others, by whose acts he could not have been benefited whether carefully or negligently performed. It is a rule of law founded on public policy, if not on necessity, that purely public or charitable bodies or agencies are not liable for the negligence of their agents and servants, though they may be liable for their own negligence. Purely charitable institutions, in this respect, are on the same footing with municipal corporations. Messrs. Cooley and Dillon, and all other reputable text-writers, place the two in the same category.—See 2 Dillon on Munic. Corp., § 984, and Cooley on Torts, p. 1011.

Municipal corporations are in terms exempt from liability on account of the negligence of their officers and agents, for the same reason that the sovereign—the state or the United States—is exempt. It is true that the state or the United States cannot be sued unless specially authorized so to be; but their exemption from liability on account of the negligence of their servants, agents, or officers rests upon the same principles as those which exempt municipal, or purely charitable corporations—that is, it is against public policy. If, however, the United States, the state, or a municipal or charitable corporation, engage in a private business or undertaking for profit, then quoad hoc it is liable just as is an individual or a private corporation. It may be that, even when liable, the state or the United States cannot be sued unless authorized by an express stat-

ute, yet they are nevertheless liable, and if suit could be brought judgment might be obtained.

It is stated in the majority opinion that the question here decided is new to this court. In this conclusion I cannot fully agree. In one sense, it is new; but in others it is hoary with age, and has been decided scores of times, and always contrary to the decision in this case. The case of *White v. Alabama Insane Hospital*, 138 Ala. 479, 35 South. 454; *Leavell v. Western Kentucky Asylum for the Insane*, 122 Ky. 213, 91 S. W. 671, 28 Ky. Lew Rep. 1129, 4 L. R. A. (N. S.) 269, 12 Ann. Cas. 827, is a recent concrete case. It is true that the opinion in that case based the nonliability on the ground that the defendant was a state institution; but, as I have shown, purely charitable corporations are in the same category as state institutions, and are exempt from liability for the same reason—that it is against public policy that the public should suffer on account of the negligence of those administering the charity or serving the public. Is it the public policy of this state that property granted or donated to the public for charitable purposes should be diverted from this benevolent and public use, to a few individuals who may be injured in person, feelings, or estate, by the negligence of agents or servants who are administering the charity?

If the body or corporation is private in character, and is not serving the public, but only those it chooses, and is so serving them for profit, then, of course, it is not a public, or a charitable, institution, and the rule we are discussing has no application, though it be a hospital, a reform school, or other benevolent agency. If, however, the body or agency is serving the public, doing the work of the sovereign, not for gain, but purely for charity, then it is no more liable for the torts

of its agents or servants than the state or the United States are liable for the torts of an agent or servant. Such charitable bodies or corporations, when created by the sovereign for this purpose, and so authorized to do this duty of the sovereign, are only liable in those cases in which the sovereign is liable. Corporations created solely for purely charitable purposes, which can do nothing except the work of the sovereign in ministering charity to the subjects, are not, and ought not to be, liable for the negligence of its servants or agents, if the sovereign itself would not be liable. This principle has been often stated and decided by this court. In the case of *State v. Hill,* 54 Ala. 67, it is said: " 'It is plain,' says Justice Story, 'that the government itself is not responsible for the misfeasances, or wrongs, or negligences, or omissions of duty of the subordinate officers or agents employed in the public service; for it does not undertake to guarantee to any person the fidelity of any of the officers or agents whom it employs, since that would involve it, in all its operations, in endless embarrassments and difficulties and losses, which would be subversive of the public interests, and, indeed, laches are never imputable to the government." —Story on Agency, § 319.

"For yet another reason, this must be true. Although the individuals who have the administration of public affairs may commit very gross outrages, it is not congruous with the ideas of order and duty that the state, the august sovereign body whose servants they are, from which proceed all civil laws, and to which we owe unstinted respect and honor, should be held capable of doing wrongs, for which she should be made answerable as for tortious injuries, in her own courts to her own children or subjects."

In the case of *Dargan v. Mobile*, 31 Ala. 469, 70 Am. Dec. 505, the disinction I am now trying to make was well made, as follows: "The question of this case is whether a municipal or public corporation is liable in damages for an injury resulting from the careless or negligent official conduct of one of its officers, in whose selection there was no negligence, and whose employment was the lawful and necessary means of executing a governmental power vested in it for the public benefit, and whose acts are not done under the supervision of the corporation. This question we decide in the negative. Because the corporation is, as to the passage of the ordinances and the appointment of the officer described in the pleadings, a government, exercising political power, it is irresponsible for the official misconduct alleged, upon the same principle which generally protects governments and public officers from liability for the misfeasances and malfeasances of persons necessarily employed under them in the public service.—Story on Agency, §§ 319, 319a, 319b, 320, 321; Dunlap's Paley's Agency, 376. Municipal corporations, quoad hoc, stand upon the same foundation with public officers, counties, townships, and other quasi corporations, charged with some public duty, or invested with some portion of the authority of the government, where the employment of officers is necessary and lawful."

The law is thus stated by that almost omniscient lawwriter, Judge Story: "The rule, which we have been considering, that where persons are acting as public agents they are responsible only for their own misfeasances and negligence, and (as we have seen) not for the misfeasances and negligences of those who are employed under them, if they have employed persons of suitable skill and ability, and have not co-operated in or authorized the wrong, is not confined to public offi- ·

cers, or agents of the government, properly so called, in a strict legal sense; but it equally applies to other public officers or agents, engaged in the public service, or acting for public objects, whether their appointments emanate from particular public bodies, or are derived from general laws, and whether those objects are of a local or of a general nature. For, if the doctrine of respondeat superior were applied to such agencies, it would operate as a serious discouragement to persons who perform public functions, many of which are rendered gratuitously, and all of which are highly important to the public interest. In this respect, their case is distinguishable from that of persons acting for their own benefit, or employing others for their own benefit. But the party who suffers the injury under such circumstances is not without redress, for he may maintain a suit against the immediate wrongdoer. Upon this ground it has been held that the trustees of a public turnpike are not liable for the misfeasances or negligences of subagents employed by them in the performance of their duty, unless they have directed the act to be done, or have personally co-operated in the negligence."—Agency, § 321, pp. 394-397.

I think these authorities conclusively show that purely charitable corporations, as to the question under consideration, are in the same category as municipalities, counties, states, etc. If so, then the *White Case*, 138 Ala. 479, 35 South. 454; *Leavell v. Western Kentucky Asylum for the Insane*, 122 Ky. 213, 91 S. W. 671, 28 Ky. Law Rep. 1129, 4 L. R. A. (N. S.) 269, 12 Ann. Cas. 827, is decisive of this question, because it was there decided that the doctrine of respondeat superior did not apply to that defendant. And, if not to that hospital, then it does not apply to this one. Both were created by the same sovereign, and author-

ized to do only works of charity, which would otherwise be done by the sovereign. The mere fact that the state makes annual appropriations to the one, and not to the other, can make no difference. Each is an arm or agency of the state, created and authorized only to do public charity.

The intimation, in the *White Case*, that the property of the insane hospital is the property of the state, is erroneous; it is no more the property of the state than is the property of the defendant corporation in this case. The state could not—if it would—take from the insane hospital the property to which it has a vested title, nor divert it from the purposes for which it was granted. A grant of property, once made absolute by the state to a public or private corporation, cannot be recalled. Vested rights, even of purely municipal corporations, are within the protection of the federal Constitution. The insane hospital is therefore no more an arm or agency of the state than are various other hospitals, such as that for the deaf, dumb, and blind, or those created by acts similar to the one which created the corporation in question.

If, however, the state should create a private corporation and authorize it to do hospital work, or to care for the insane, for profit, then of course it would not be a charitable institution or corporation, and would not fall within the rule under consideration. If a charitable corporation should be authorized to do other things than charity, for a profit, then quoad hoc it would not be a charitable institution, and would be liable as are other private business corporations. The same is true of municipal corporations, or of even the state or the United States; but the property of no one of these, which is devoted exclusively to governmental public,

or purely charitable, purposes, can be subjected to the payment of the liability.

This is true even of railroad corporations : Their depots, tracks, or other property necessary for the corporation in its service of the public, as authorized by its charter, cannot be subjected to the payment of judgments against the corporation. In other words, property devoted to a public use, whether for governmental, charitable, or other purposes, is not subject to execution or other legal process. The right of the individual to such property is secondary to the right of the public. This has been decided in this state too often, as to charitable institutions, municipal corporations, railroads, and other quasi public corporations, to need any citation of authorities.

Apply this undoubted doctrine to the case in hand, and what is the result? If the plaintiff shall succeed in recovering a judgment, if the pleas in this case are true, defendant has no property, and cannot acquire any property which can be subjected to execution, sale, or other legal process. Even the English cases uphold this doctrine, those that hold the charity liable in certain cases. All the authorities in the world, so far as I can find, hold that property devoted to a public use cannot be sold under execution or other legal process, except the Rhode Island case, and this decision was so abhorrent to the people of Rhode Island that the very first legislature which assembled after its rendition overruled it by an express statute.

Municipalities, counties, and states can be compelled by mandamus to levy and collect taxes with which to pay such judgments; but charitable corporations have no such powers or rights—there is no feasible means of obtaining satisfaction of judgments against them. For this reason the "trust fund doctrine" is strictly ap-

plicable, not on the ground that no liability can be fixed or fastened upon such corporations, but that, if so fixed or fastened, the judgment could not be satisfied, and obtaining it would be useless. And the law never requires, or even allows, the doing of a wholly useless thing. This will clearly appear from an examination of *Fordyce's Case,* 79 Ark. 559, 96 S. W. 155, 7 L. R. A. (N. S.) 485. There, by negligence or fraud, the plaintiff had obtained a judgment against a public library, and sought by execution to enforce a sale of its property. The court enjoined the sale. The opinion was written by Judge Rose, one of the greatest lawyers America has produced, and is therefore one of the best considered cases in the world on the subject.

The following authorities are conclusive on this question: "A valid vested estate in trust (for charitable purposes) can never lapse or become forfeited by any misconduct in the trustee, or inability in the corporation to execute it, if such existed. Charity never fails; and it is the right as well as the duty of the sovereign, by its courts and public officers, as also by the Legislature (if needed), to have the charities properly administered."—*Girard v. Philadelphia,* 7 Wall. 15, 19 L. Ed. 57.

"If a defendant permits a judgment to go against him which he might have successfully defended, he may still claim his homestead and other exemptions. Though a judgment is rendered against a railway company, yet its franchise or other property necesssary to the operation of its road cannot be sold under execution, because that would interfere with the public good.—*East Alabama R. Co. v. Doe,* 114 U. S. 340, 5 Sup. Ct. 869, 29 L. Ed. 136; 1 Freeman, Executions, § 179. The fact that a city or county is by statute liable to be sued does not necessarily imply that its property may be taken

in execution. This has been repeatedly decided.—*High-way Com'rs v. Martin*, 4 Mich. 557, 69 Am. Dec. 333; *Waltham v. Kemper*, 55 Ill. 346, 8 Am. Rep. 652; *White v. Bond County*, 58 Ill. 297, 11 Am. Rep. 65; *Bussell v. Steuben*, 57 Ill. 35; *Hill v. Boston*, 122 Mass. 352, 23 Am. Rep. 332. The judgment is conclusive of the amount of the debt or demand, but it does not conclude the question as to the liability of any property to seizure under it. That is a question that may never arise."—*Fordyce v. Woman's, etc., Ass'n, supra.*

"In every city of any considerable size may be found one or more hospitals organized and maintained by the city for charitable purposes and one or more hospitals maintained by private benevolence, under the control of trustees appointed or elected as the donors may direct or the statute may require. But a devise to a city for charitable purposes is valid.—*McDonough v. Murdoch*, 15 How. 367, 14 L. Ed. 732; *Perin v. Carey*, 24 How. 65, 16 L. Ed. 701. Let us suppose then that a city had two hospitals, one created and supported out of the municipal revenues and another dependant upon a charitable gift and the donations of private individuals, both under the control of the city as a trustee. According to the doctrine contended for in behalf of the appellants, the former could not be sold under execution because it belonged to the city, and the latter could thus be sold because the city was only a trustee; and this, notwithstanding both were charities instituted 'for the public good.' Such a distinction cannot be supported except by ignoring the general public interests common to both of these cases. The question is not as to who holds the property in trust, which is merely a personal consideration, a matter of policy and expediency; but it relates to the objects for which all charitable issues are created, and on account of

which they are highly favored by law. A discrimination based, not on the character of the trust, but on the character of the trustee, would be false and misleading. The property of a public corporation, such as a railroad or bridge company, essential to the exercise of its corporate franchise and the performance of its duties toward the public, cannot, without statutory authority, be sold to satisfy a common-law judgment, either on execution, or in the pursuance of an order or decree of court."— *Fordyce v. Woman's, etc., Ass'n, supra.*

The opinion in this case seems to make a distinction between a pay patient in a charitable institution, and one who does not pay. The authorities all hold that there is no difference as to the liability of purely charitable institutions for the torts of their agents, as to pay, and nonpay, patients. This is well and truly stated, in a note to the report of the case of *Horden v. Salvation Army,* 139 Am. St. Rep. 899, as follows: "The authorities seem to agree that an institution, otherwise charitable in its nature, does not lose its character as such and its consequent exemption from responsibility for the torts and negligence of its servants and agents, from the fact that persons, availing themselves of its benefits, at least such as are pecuniarily able to do so, contribute money to pay the expenses of the institution; their contributions going to the charity itself and not being a source of private gain to the founders or managers. This has been held true in the case of hospitals and institutions of learning, as will hereafter be seen. It has been decided that an institution does not lose its charitable character so as to be liable for the death of a child through the negligence of an experienced employee, merely because the mother of the child contributed to the expense of its care at the in-

[Tucker v. Mobile Infirmary Association.]

stitution.—*Cunningham v. Sheltering Arms,* 135 App. Div. 178, 119 N. Y. Supp. 1033."

Most all the cases are reviewed or cited in the opinion and notes to this case.

Of course, if a hospital or an educational institution is operated for private gain and profit, then it is not a charitable institution, and the doctrine or rule being considered does not apply. The very definition of "charitable trust" or "charitable institution" is that it is for the use and benefit of the public, and not for that of particular individuals. A "charity" is a gift to be applied for the benefit of an indefinite number of persons, thereby relieving the government pro tanto of the discharge of its duties as to educating the minds, training the hands, improving the morals, and relieving the pains and suffering, of such indefinite number. If it be not a gift, or if it be a, gift to a definite number, then it is not a charity, but is a private business, and is in the same category as other private business corporations. To be a charitable trust there must be a gift by the sovereign or by individuals, and it must be for a public purpose, either local or general. The gift must extend to the poor as well as to the rich. Charitable uses or trusts may extend to almost anything which tends to promote the well-doing or the well-being of the genus homo. It must, however, be to an indefinite number, and be for a, purpose which the government or sovereign ought otherwise to do, in order that it be protected from spoilation or diversion, as other property is protected which is devoted to a public use, such as city halls, courthouses, state capitols, universities, public hospitals, etc.