(118 So. 741)

BIRMINGHAM BAPTIST HOSPITAL v. BRANTON. (6 Div. 946.)

Supreme Court of Alabama. Nov. 1, 1928.

Rehearing Denied Dec. 6, 1928.

466

Altman, Taylor & Koenig, of Birmingham, for appellee.

Harris Burns and Coleman, Coleman, Spain & Stewart, all of Birmingham, for appellant.

THOMAS, J. The action was brought under the homicide statute by the father for the death of his minor son. Plaintiff's cause is stated in two counts. All other counts were withdrawn. The gist of the cause of action is contained in count H, as follows:

"Defendants so negligently conducted themselves in or about the birth or delivery of said minor son of plaintiff, that as a proximate consequence of said negligence, plaintiff's said minor son died."

Count I reads:

"Defendants so negligently conducted themselves in or about nursing plaintiff's said minor

son that as a proximate consequence of said negligence, plaintiff's said minor son died."

Demurrer being overruled to said counts, the defendant pleaded the general issue in short by consent, with leave to give in evidence any matter which, if well pleaded, would constitute a legal defense and with leave to plaintiff to give evidence to prove any legal reply thereto. The trial resulted in judgment for plaintiff.

The general duties of a hospital to patients are discussed in Tucker v. Mobile Inf. Ass'n, 191 Ala. 572, 68 So. 4, L. R. A. 1915D, 1167; Birmingham Baptist Hospital v. Branton, 216 Ala. 326, 113 So. 79, and need not be repeated.

This court has established a general line of demarcation between the civil rights of the mother and child to be born. It is concurrent with separate existence of the mother and child by the birth; and parental injury before the birth is no basis for action in damages by the child or its personal representative. The mother of an unborn child may recover damages to her and it, in ventre sa mere, "if such injury and damage is not too remote." Stanford v. St. Louis-San Francisco Ry. Co., 214 Ala. 611, 108 So. 566; Dietrich v. Northampton, 138 Mass. 14, 52 Am. Rep. 242; Allaire v. St. Luke's Hospital, 184 Ill. 359, 56 N. E. 638, 48 L. R. A. 225, 75 Am. St. Rep. 176. The demurrers to counts H and I were properly overruled. And the rights of this mother in and about childbirth were considered in Birmingham Baptist Hospital v. Branton, 216 Ala. 326, 113 So. 79.

The mother and wife testified of the fact as to the birth; that she told the husband to get something to eat, and before he left the latter requested the nurse to remain with the wife, about to be confined, and that she should not leave the room in his absence, to which request the nurse acquiesced; that said nurse had examined witness previous to the husband's departure; thereafter, and before the nurse left the room, witness "asked her to call a doctor, and she laughed and said" that witness "would be suffering more" before she "would need a doctor"; that said nurse was the last one witness "saw until the baby was born"; that witness had "pushed the button or buzzer" to summon aid, and there was no response to such call; that prior to the birth of the child, she did "feel the child moving" in her womb or abdomen; that witness, over defendant's objection and exceptions, was permitted to testify as follows:

" * * * State whether or not you told the nurse there,—a student nurse in the hall,—what your condition was, and asked her to call a doctor, about 11 o'clock, or some time before, or immediately before the child was born? * * *

"I asked Miss Stroud, the little student nurse, to call Dr. Garber, and she said all right, and she went out in the hall to call him, and Mrs. Wood told Miss Stroud that she had charge of my case, and that she would call Dr. Garber whenever I needed him."

The account of the witness as to what occurred immediately preceding, at the birth, and immediately thereafter was:

"When she came in it was about 11 o'clock, —Mrs. Wood,—and she took my temperature and asked my husband to leave the room, that she had to examine me, and when she did that I told him to go and get something to eat, and before he left he asked her to remain in the room with me until he got back, and she said she would, and as soon as he left she did not examine me, and before she left out I asked her to call the doctor, and she laughed and said that I would be suffering more than I was then before I would need a doctor, and she was the last one I saw until the baby was born. * * *

"I had a push-button or a buzzer that I could touch over my head, and I pushed that, but nobody came in response to that touch of the button. After the child was born I heard it strangle like it was crying, and I called for a nurse, and Miss Stroud,—they knew and saw what had happened,—and she went out in the hall and called the doctor, and she got back in there before Dr. Cheves got in there, and that was 10 or 15 minutes after the child was born. I heard the child make a noise after it was born like it was trying to cry. I can't say whether there was a good deal of blood and after-birth there then, because I didn't raise up to see, but I could hear the child crying like it was strangling."

There was other testimony that the umbilical cord was around the baby's neck at the time it was born, and that this was a circumstance that caused, "more than likely, the baby to be born dead or practically so." The cord was not tight about the baby's neck. The nurse stated that the baby never did breathe, though the heart beat of the child was perceptible.

Dr. Cheves testified that when called he went to the patient's room; that the "head of the child was born," and he "finished delivering the child" with the cord very loose around the neck, cut the cord, and finished the delivery, and "after the baby was born it never did breathe"; the "cord was pulsating six times a minute;" that "the normal cord pulse when a child is born is about 120"; that the baby was "perfectly white all over"; that if its death was due to strangulation by reason of a tight cord about its neck, the body of the child would have been blue; that it was his opinion that the child was born dead; that it never did breathe or attempt to breath; that "stillborn babies are white."

The rules of the giving or refusing of general affirmative instructions requested are well understood. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135; Southern States Fire

Ins. Co. v. Kronenberg, 199 Ala. 164, 74 So. 63; Penticost v. Massey, 202 Ala. 681, 682 81 So. 637; Allen v. Fincher, 187 Ala. 599, 65 So. 946. The material questions of fact—whether Mrs. Branton was admitted to the hospital as a patient; whether defendants knew or were informed that she was "in labor," or that she duly requested the call of her physician, and whether there was a reasonable compliance to such request for such assistance, and whether or not the child was born without due assistance of nurse or physician, immediately before, at the time of, and immediately after the birth of the child; whether it was stillborn or was normal and alive at birth; and whether after the birth it perished from the lack of attention—were for the decision of the jury.

Appellant concludes the argument for affirmative instruction with the observation: "Certainly no duty could be owing to an unborn child without knowledge of its existence." The suit is by the father for his injuries in the premises as to his wife, and child about to be born, and as to him and his wife and child, the measure of duty was that degree of care, skill, and diligence used by hospitals generally in that community, and by the express or implied contract of the undertaking. When the nurse was to examine the patient and requested the absence of the husband, there was a tendency of evidence that he made the reasonable request that the nurse remain with the wife until his return; there was a tendency of evidence of the installation of the call bell for the patient, that they made use of the same, requested the professional assistance incident to the purpose of the contract right in the hospital, and that it was not given by the immediate call of her physician or the presence of a nurse at the crucial moments before, at, and after the birth of the child. This was the basis for ascertainment of material fact and duty in the premises, for the failure of which the husband may rest his right of action. There was no reversible error in refusing defendant's charges denominated W and X. See authorities below and Conway v. Robinson, 216 Ala. 495, 113 So. 531.

Charge Z, as follows: "I charge you gentlemen if you believe the baby was stillborn then you cannot find a verdict for plaintiff," was, without error, refused for the use of the words "if you believe" without hypothesis on a belief of the evidence. Walls v. Decatur Fertilizer Co., 215 Ala. 426, 111 So. 214; Birmingham B. R. Co. v. Nelson, 216 Ala. 149, 112 So. 422; Scott v. L. & N. R. R. Co., 217 Ala. 255, 115 So. 171.

We have carefully considered the several objections and exceptions on the admission of evidence, and find no error.

The assignment of error rested upon the ruling of the court as to plaintiff's opening statement to the jury does not disclose a ruling of the trial court for which we would reverse. The statements admitted were within the issues of material fact presented by the complaint of the husband and father.

The amount of the husband's hospital bill was different from that made the subject of the suit by the child in Norwood Hospital v. Jones, 214 Ala. 314, 107 So. 858. This proof was competent as showing, or tending to show, a contract on the part of the hospital to render services required in the premises.

There was no motion for a new trial. We have carefully considered the several assignments of error and arguments based thereon, and are of the opinion that the judgment of the lower court should be affirmed.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.

Affirmed.

On Rehearing.

PER CURIAM. Application for rehearing overruled. All the justices concurring.