119 So.2d 8

**MOBILE INFIRMARY**

v.

**John G. EBERLEIN, Jr.**

1 Div. 826.

Supreme Court of Alabama.

March 17, 1960.

Johnston, McCall & Johnston, Mobile, for appellant.

362

M. A. Marsal, Mobile, for appellee.

STAKELY, Justice.

This action was brought by John G. Eberlein, Jr. (appellee) against Mobile Infirmary, a corporation (appellant), in the Circuit Court of Mobile County, to recover damages for the death of Carol Merlee Eberlein, the minor daughter of the plaintiff.

The cause of action is set forth in two separate counts numbered One and Two, respectively, each of which attempts to allege simple negligence in varying terms. The court overruled the demurrer to each count and the defendant thereupon filed its plea of the general issue. The case was submitted to the jury which returned a verdict in favor of the plaintiff for the sum of $45,000. Motion for a new trial was overruled and this appeal followed.

Stated as briefly as possible the evidence showed that the plaintiff John G. Eberlein, Jr. and his wife, who were the parents of the deceased minor, Carol Merlee Eberlein, brought their fifteen year old daughter to the Mobile Infirmary on the afternoon of January 22, 1958, for the purpose of having her admitted to the psychiatric unit of the hospital for treatment by her physician, Dr. Ronald B. Mershon of Mobile.

The girl was apparently suffering from some sort of mental or emotional disturbance and apparently required a doctor's treatment. She had been troubled with such condition for a period of several days which had become worse on the night of January 21, 1958. Early the next morning Mrs. Eberlein called Dr. Mershon and gave him a brief report on the condition of her daughter and the doctor requested that they bring her to his office later on that morning. Thereafter the minister of the Eberleins phoned Dr. Mershon and stated that Carol Eberlein would be unable because of her condition, to come to his office. Thereupon the doctor suggested that they take her to the hospital, the Mobile Infirmary, and enter her in the psychiatric unit or clinic and that he would meet them there. The girl was carried to the hospital. According to tendencies of the evidence the girl was talkative, restless, critical, hostile, sarcastic and mentally disturbed. She was brought to the hospital dressed in her pajamas by her mother and father and accompanied by her aunt and her boy friend.

After admission she was shown to her room by Mrs. Marvel Fullerton, the Su-

pervisor on duty, and Miss Myrtle Ferguson, a registered nurse in the psychiatric ward. This room was No. 105, was on the south side of the corridor in the psychiatric ward two doors east of the nurses' station. Her room had two single beds, one of which the patient occupied and the other of which remained vacant.

Dr. Mershon made the arrangements with the hospital and the Eberleins carried their daughter there pursuant to these arrangements. Dr. Mershon took a history of the condition of Carol Eberlein in connection with her case. This was given to him by Mr. and Mrs. Eberlein in the psychiatric ward in the hospital before he went to speak to Carol. This was on January 22, 1958, about 2:30 or 3:00 o'clock in the afternoon. Mrs. Eberlein told him that her child had not slept the night before and had not slept much for the last three nights and that she had in fact slept poorly for about a week. According to the doctor the mother said that her child had been irritable, moody, preoccupied with religious matters and that she was very much in love with a young high school student. According to Dr. Mershon the mother also stated to him that her daughter had been disturbed for a long period of time and that unlike her, she had become rude and irritable at Christmas time and on an occasion prior to that.

After Dr. Mershon talked with the family he went to see Carol Eberlein in her room. According to his testimony she paid no attention to his conversation with her and did not appear to recognize his being in the room. She repeatedly called the name of "Dick" and asked "Where is Dick?" She would not let the doctor touch her and would jerk away from him. He noted that her eyes were widely dilated, which, according to him, is the case in most cases of anxiety.

After his examination the doctor prescribed medication to put the girl to sleep. With the assistance of Mrs. Fullerton, he gave the medication for sleep to the girl and told the nurse that he wanted to keep her asleep for about twenty-four hours so that she could get fully rested. Dr. Mershon saw the girl the next morning at eight o'clock and that was on January 23, 1958. She was sleeping quietly and her treatment was going as desired. He did not feel that the child needed a special nurse. So she did not have a special nurse. He saw her again that afternoon at 5:30. He saw her again the next morning, January 24th, at 8:00 o'clock and according to his testimony, she was getting along as well as could be expected. She had rested well all night and had taken some nourishment. Mrs. Eberlein had told Dr. Mershon that she would like to remain with her daughter and he advised her against it. The doctor stated that it was a policy with all mental cases or cases that are emotionally disturbed for the mother not to stay with the child.

According to the testimony of Dr. Mershon the hospital and the nurses were acting in accordance with good and accepted standards of hospital care and service during the time the girl was there. According to his testimony, in his opinion, the staff and employees were sufficient in number and in organization and the psychiatric unit in the Mobile Infirmary was operated according to the prevailing practices in this area of the country. In fact he said that the Mobile Infirmary was one of the best and that the number of personnel and the training of that personnel was as good or better than any other in the south. He considered no additional care and attention necessary for Carol and that she was getting satisfactory care and attention. At no time did he feel that there was anything about her condition that required somebody to watch her all the time.

There was testimony introduced by the plaintiff tending to show that it was improper for both sexes to be housed in the mental unit in the Mobile Infirmary. There was testimony introduced by the plaintiff tending to show that men and women patients in the mental unit entered one another's room. There was further testimony

introduced by the plaintiff to the effect that alcoholics were treated in the psychiatric unit in the Mobile Infirmary and that the doors to the rooms in the clinic had no locks on them.

Dr. Mershon, who was qualified as a psychiatrist, stated that men and women patients should not be segregated and should be allowed to get together and talk, because that would tend to help them. He held to the view that mental patients should be treated as normally as possible.

The evidence showed that there were ten rooms in the psychiatric ward, some on one side of the hall and some on the other side and at the end of the hall there was a recreational room where both men and women were allowed to enter. The defendant's testimony tended to show that men were not allowed to enter the rooms of women patients and that the hospital took steps to prevent this by having the patients watched by nurses in the hallway. There were at all times on duty a supervising nurse and a nurse's aid, also an orderly and a maid whose duty it was to do cleaning up work.

Dr. Claude L. Brown of Mobile, who specializes in psychiatry, expressed the opinion that the Mobile psychiatric ward at the Mobile Infirmary was adequate and staffed with personnel whose qualifications were adequate. He had examined the record of treatment of the girl and was of the opinion that the girl was afforded proper care and attention by the hospital authorities.

Dr. Mershon first prescribed sodium amytal in dosages of $7\frac{1}{2}$ grains each, by injection. This was to keep her asleep for a period of twenty-four hours. It was not given for the purpose of producing deep sleep or a coma, but only a more or less normal sleep. She was given sodium amytal at intervals of about 5 or 6 hours. Dr. Mershon gave the first dose at the time of admission, which was about 3:00 o'clock P.M. on January 22, 1958. She had another dose around 4:00 o'clock in the morning. Then she had it again about 11:00 or 12:00 o'clock A.M. on the 23rd, and again about 5:00 o'clock P.M. and at 1:30 A.M. on January 24th, and she was also given vitamins and fluids.

On Friday, January 24th, she was given a different medication. According to the testimony of Dr. Mershon, she had not had any sodium amytal since 1:30 in the morning of January 24th and at 8:00 o'clock that morning when Dr. Mershon came to the ward, he decided to give her no more sodium amytal and to put her on sparine. Sparine is one of the new medicines for emotional mental illness. It is called a tranquilizer. It calms the excitement of the central nervous system, relieves anxiety, irritability and thoughts which tend to disturb the patient. Carol Eberlein was given two doses of sparine each of 100 miligrams, one at 9:00 A.M. and the other at 1:00 P.M. on January 24, 1958.

Carol Eberlein was found dead in the righthand side of the closet in her hospital room. The closet was about eighteen inches deep. She was in a kneeling position with her face to the corner of the closet and was found on Friday, January 24, 1958, by Clarence Tool, a male attendant in the psychiatric ward at the Mobile Infirmary. He had come to work that afternoon at five minutes to three. He stated that he went to her room just after he came on duty and seeing that there was no one in the bed, he went to pick up the water pitcher from the table, which he filled every day while on duty, and as he started out of the room, he saw her in the closet. He went immediately to get Miss Naomi Watts, the supervising nurse on duty in the psychiatric clinic at the time, who had also just come on duty at approximately five minutes to three o'clock. Miss Watts had just completed taking her report from Mrs. Fullerton, the other supervisor, and was going about checking the rooms, when Clarence Tool came and got her and they went to Room 105 where the girl was found in the closet. She was in a kneeling position, one hand up and her head was back. One of her legs was inside the closet and the other was pretty much outside. She was wearing pajamas, the bottoms of which

were wet. The body was still warm. The closet was partitioned with sliding doors. The two sliding closet doors were resting against a clothes rack that had been pulled out on the next adjoining partition of the closet and this reduced the entrance space to the closet. A small puddle of urine was found on the floor about 2½ to 3 feet from the closet. Pictures were introduced in evidence to show that this entrance space was sufficiently large to permit Mrs. Marvelle Fullerton, the supervising nurse, to get into the closet with the doors in the position in which they were found. The side rails on the bed sides were up. They were there to keep patients from falling out of bed.

The girl had a slightly abrased place on her chin, her knees were bruised and she had some bruises below her knees and a pressed place in the skin across the right leg which was caused by her leg resting on the track of the sliding door. An imprint of the figure from the lace on the collar of her pajamas showed on the root of her neck on one side. An autopsy, which was authorized by the father, was performed by Dr. Earl B. Wirt, a pathologist and assistant to the Coroner. It did not reveal the cause of death. From the autopsy alone Dr. Wirt was unable to establish the cause of death. Dr. Wirt gave an opinion that the cause of death was asphyxia. This was not revealed by the autopsy report, however.

Tendencies of the evidence showed that the girl was checked by a graduate nurse every thirty minutes and that nurses aids and attendants who were on duty all of the time in the ward, watched over the patients and observed them from time to time in their rooms. There was someone in the hall at all times. On January 24th, tendencies of the evidence show, that the girl was seen at 2:25 P.M., 2:30 P.M., 2:40 P.M., and that it was around 3:00 P.M., immediately after the change of shifts, that the girl was discovered in the closet.

The body of the girl was x-rayed after death twice, once at the Mobile Infirmary and once at the Mobile County Hospital. These x-rays were negative. Dr. Wirt, who performed the autopsy, examined the superficial parts of the girl's body, also the internal organs of the body, the brain and nervous system and a chemical analysis was made. She had not been raped or sexually molested in any way. He was unable to find anything which would have caused the death of the girl. He did not think that the imprint of lace on the root of the neck from the girl's pajamas showed strangulation. Furthermore there was no damage to the larynx or the trachea, which is the cartilaginous line tube which connects with the larynx carrying out air to the lungs. Nor did he find any damage to the thyroid gland which lies on either side of the larynx and which could be damaged by choking. He did not find any damage to the pharynx, which is in the back of the mouth, nor to the hyoid bone, which is a very delicate bone that lies in the neck behind the mandible. The mandible is the jaw bone. There was no damage to the esophagus.

It was Dr. Wirt's theory that the asphyxia could have been brought about by the girl fainting in the closet in an upright position with her head back, which caused her to relax and to swallow her tongue and this resulted in strangulation. The only evidence to support this theory, other than the position in which the girl was found, was the minimal amount of blood particles found in the lungs. According to his testimony sparine in rare instances will cause a fall in blood pressure in an occasional patient who receives the drug for the first time and that patients who have a fall in blood pressure will faint and fall to the floor. He said this was an extremely rare finding. Neither Dr. Wirt nor Dr. Claude L. Brown considered the dosages of sodium amytal and sparine as excessive. The medical chart of the girl showed that her blood pressure was normal when taken.

James Eberlein, Carol's uncle, went to the hospital and after seeing her dead was told by the hospital staff that she was found in the closet of her room. This witness was a licensed embalmer and mortician who had

more than twenty years experience. He had taken a six months concentrated course at Vanderbilt University, studying anatomy, pathology, bacteriology, hygiene, bookkeeping, mortuary law, embalming and finger printing. He stayed with the body for many hours after the death and was present during the autopsy which was performed by Dr. Wirt, the staff pathologist for the Mobile Infirmary. James Eberlein described the marks that were found under Carol's chin and the discoloration on her neck and testified, over the objection of the defendant, that in his opinion death resulted from someone placing pressure around her neck.

After discovering the girl's body in the closet, the nurses on duty in talking to each other said, "they were just wondering whether maybe he (Mr. Postma) had wandered into the room." Mrs. Zula Mae Overstreet, a stranger to the Eberlein family and who had been a patient for five days in the psychiatric ward, visited her mother in the phychiatric ward in the Mobile Infirmary the day after the girl was found dead. According to her testimony as she passed an open door in the psychiatric ward she was attracted by a man who was confined to a bed screaming, crying and begging that if they would release him and let him up, "I promise I won't touch her any more." According to her he said, "If you will just let me up, I'll promise I won't touch her any more."

According to the testimony, Mr. Postma was a Belgian seaman and had been released from the hospital and had probably gone back to Belgium when the plaintiff discovered his name. According to tendencies of the evidence he was brought to the hospital in the early part of December 1957 and was released from the hospital about the middle of February 1958. According to tendencies of the evidence when he first entered the hospital, but only at that time, he was put in "straights", straps to hold him in bed, not that he showed any violence towards other patients but in order to keep him from breaking out of the doors or windows of the hospital.

There was testimony tending to show that there is a warning on the label of the bottle of sparine in capital letters that anyone receiving such drug must be kept in bed and observed.

A juror asked Mrs. White-Spunner, the Administrator of the hospital and a witness for the defendant, whether any changes had been made in the hospital procedure since the death of Carol Eberlein. Mrs. White-Spunner replied, "We are observing them all the time; in fact I feel sure that they won't be sedating anyone else and leaving them alone again."

■ I. This case presents a sad and tragic story. On the one hand the father is suing a hospital for the death of his daughter. Under the statute (§ 119, Title 7, Code of 1940), he has such right. On the other hand the defendant is a hospital, dedicated to the purposes of a hospital. Under the undisputed testimony at the time of the girl's death, the Mobile Infirmary had an adequate and competent staff in the psychiatric ward. The number of patients in the ward ranged from fifteen to twenty-two. There were ten rooms for the patients. Only Carol Eberlein occupied the room in which she was placed. The other bed in the room was not used. At one end of the hall there was a recreational room in which both men and women patients were allowed to enter. Television was provided in this room and other things for the recreation and diversion of the patients. There were at all times nurses in the hallway whose duty it was to see that the men and women patients did not go into the rooms of each other. While there were no locks on the doors of the rooms of the patients, a regular check was made of each room every thirty minutes by the nurses.

There are many assignments of error in this case but we believe that we can get to the heart of this case at once by considering the duty which was placed on the hospital under the circumstances in the case.

It is insisted with great vigor by the appellant that the duty resting on the hospital

was not laid down by the trial court. It is argued that this is shown by written charges requested by the defendant which were refused, by the court's oral charge and by the written charges given at the request of the plaintiff.

■ It is insisted by the appellant that the duty of a hospital to a patient is to exercise that degree of care, skill and diligence used by hospitals generally in the community and as may be required by the express or implied contract of undertaking. This statement of the duty is supported by the following cases. South Highlands Infirmary v. Galloway, 233 Ala. 276, 171 So. 250; Birmingham Baptist Hospital v. Branton, 218 Ala. 464, 118 So. 741.

It is argued that the jury was allowed to speculate as to what duty the hospital owed the plaintiff's intestate because of the failure of the court to charge the jury on the law of the case.

■■ Error is assigned to the action of the court in giving Charge No. 1 requested in writing by the appellee which reads as follows:

"1. The Court charges the jury that negligence in the case that we are trying is defined to be a failure to exercise reasonable and ordinary care, diligence and skill in respect to the duty so assumed and undertaken by the hospital."

It is argued that this charge does not define "the duty so assumed and undertaken by the hospital" but leaves to the jury to decide what duty was assumed and undertaken by the hospital. Since the court did not attempt to define what duty the hospital assumed and undertook with respect to the plaintiff's intestate, it is argued that the charge submits a question of law to the jury and accordingly was bad and should not have been given. We agree. Further we think that Charge No. 1 is also bad because it leaves to the jury the determination of another question of law, viz.: what constitutes "reasonable and ordinary care, diligence and skill?" It seems to us that the court should have instructed the jury as to the meaning of the phrase "reasonable and ordinary care, diligence and skill" as it applies to those engaged in operating a hospital. As we have shown the measure of duty was that degree of care, skill and diligence used by hospitals generally in the community and as may be required by the express or implied contract of the undertaking. This court has held on various occasions that a charge submitting questions of law to the determination of the jury should not be given and the giving of such a charge is reversible error. Johnson v. McNear, 255 Ala. 457, 52 So.2d 154; Wert v. Geeslin, 37 Ala.App. 351, 69 So.2d 718, certiorari denied 260 Ala. 701, 69 So.2d 724; Townsend v. Adair, 223 Ala. 150, 134 So. 637; Buffalo Rock Co. v. Davis, 228 Ala. 603, 154 So. 556.

■■ Furthermore we consider that the trial court was in error in giving for appellee written requested charge No. 3, which reads as follows:

"The Court charges the jury that broadly speaking ordinary care, that care which persons of common prudence exercise under like conditions, is the degree of care recognized by the courts throughout our State."

Possibly this charge was taken from the case of South Highlands Infirmary v. Galloway, 233 Ala. 276, 171 So. 250, where the identical language appears in the opinion of the court. However, statements of law in judicial opinions are not always proper for jury instructions in other cases. Hale v. Cox, 222 Ala. 136, 131 So. 233; Torian v. Ashford, 216 Ala. 85, 112 So. 418; Atlantic Coast Line Railroad Co. v. Adams, 37 Ala.App. 538, 74 So.2d 524.

The care required of the hospital is not that care which persons of prudence exercise under like conditions, but that care which persons of common prudence, engaged in the hospital business, exercise under like conditions.

■ Appellant's written requested Charge 19, which was refused by the court, reads as follows:

"19. The Court charges the jury that the measure of duty on the part of the Mobile Infirmary to the Plaintiff's minor daughter was that degree of care, skill and diligence used by hospitals generally in this community, and if you are reasonably satisfied from all the evidence in this case that the Defendant's agents, servants or employees rendered that degree of care to the Plaintiff's minor daughter, then your verdict should be for the Defendant."

The foregoing charge was not covered by any other requested charge given by the court either for the appellant or the appellee. Nor was the subject matter of the charge covered in the court's oral charge to the jury. In its oral charge the trial court instructed the jury that if the defendant negligently failed to give Carol Eberlein proper treatment, care and protection, which defendant was obligated to give her and that the defendant was negligent as alleged in not giving Carol Eberlein the care and protection necessary, then the jury might find for the plaintiff, if such negligence was the proximate cause of her death. The trial court did not define what is meant by proper treatment, care and protection which the defendant was obligated to give the child nor did it define what is meant by the defendant's being negligent as alleged. In the case of Andrews v. State, 159 Ala. 14, 48 So. 858, 863, this court said:

"In charging the jury, it is the duty of the judge to give the law applicable to all theories presented by the testimony, and, if he recapitulates the evidence on one side, to recapitulate it also on the other side, and not to indicate, by the matter or manner of the charge, what his own views are as to the effect of the testimony."

See also Lamar v. King, 168 Ala. 285, 53 So. 279.

In the case of South Highlands Infirmary v. Galloway, 233 Ala. 276, 171 So. 250, 252, the plaintiff, who was the appellee on appeal, insisted that the defendant's Charge 19 was erroneous in defining care as follows: "The same degree of care, skill and diligence as used by hospitals generally in this community." This court in approving the statement contained in the charge said that in hospital cases the rule is thus stated:

"* * * the measure of duty was that degree of care, skill, and diligence used by hospitals generally in that community, and by the express or implied contract of the undertaking."

It appears that the appellee lays emphasis on the words "by the express or implied contract of the undertaking." In Birmingham Infirmary v. Coe, 206 Ala. 687, 91 So. 604, the trial court by way of explanation of a preceding instruction said, in referring to the case of Birmingham Baptist Hospital v. Branton, 218 Ala. 464, 118 So. 741, the following:

"The added expression in the Branton case, supra, 'and by the express or implied contract of the undertaking,' is unquestionably correct, and pertinent in framing an inclusive statement of the law applicable to all cases. It is not to be construed as imposing a greater 'degree of care, skill, and diligence' than that 'used by hospitals generally in that community,' unless there is some evidence of an express or implied contract imposing a higher obligation than that implied from the admission of a pay patient on the customary basis. Such is this case, and we approve the statement of the degree of care in charge 19 as applied to the evidence in the particular case. A different situation might arise if it were affirmatively shown that hospitals in that community generally followed practices lacking in ordinary care for patients received for hospitalization."

In the case of Birmingham Baptist Hospital v. Branton, 218 Ala. 464, 118 So. 741, 744, the plaintiff brought an action against the hospital charging negligence in and about the birth or delivery of the minor son of the plaintiff. In stating the rule of law as to the measure of duty owed by the hospital the court said: "* * * the measure of duty was that degree of care, skill, and diligence used by hospitals generally in that community, and by the express or implied contract of the undertaking." See also 41 C.J.S. Hospitals § 8, p. 349, which reads as follows:

"The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking."

The case of Birmingham Baptist Hospital v. Branton, supra, was cited as authority for the last quoted statement.

■ The appellee contends that there was a contract, either express or implied, imposing a higher duty of care on the defendant hospital than ordinarily required under the law. We find no evidence of such a contract. Tendencies of the evidence do show that the appellee contracted for a private room and that mentally disturbed men and women had been known to have entered the rooms of each other. There is no evidence to show that mentally disturbed men or women were allowed by the hospital to enter the room of the girl in this case.

Accordingly, applying the law of the above decisions to the case before us we consider that appellant's requested charge No. 19 correctly states the law of this case and that it was error for the trial court to refuse appellant's Charge No. 19. Proof that a contract was made for a private room and no arrangement was made for a special nurse under the express advice of Dr. Mershon, does not mean that a nurse should have been in the girl's room all of the time, even assuming that the hospital

knew that men patients had entered the rooms of women patients. We cannot place such a burden on hospitals.

■ II. The appellant predicates error on the refusal of the court to give Charge No. 22 requested in writing by the defendant. This charge reads as follows:

"22. The Court charges the Jury that if you are reasonably satisfied from the evidence in this case that the circumstances attendant to the death of Carol Merlee Eberlein were not such as a reasonably prudent person similarly situated would have anticipated, then your verdict should be for the Defendant."

If the charge had been given we would not regard the action of the court as reversible error because ordinarily no one is required to guard against or take measures to avert that which a reasonably prudent person under the circumstances would not anticipate as likely to happen. But since the charge was refused we are not willing to say that such refusal constitutes reversible error because we think the charge can be confusing and misleading to the jury.

■ III. It is further insisted that James Eberlein, who was a brother of the appellee, was permitted over the objection of the appellant, to give his opinion as to the cause of the intestate's death. After the objection was overruled by the court and an exception taken thereto, the witness stated that the cause of death in his opinion was from something tight being pulled around the child's throat, that she could have been choked or hung and that this was the cause of the death.

We do not think that the court was in error in allowing this witness to testify as an expert. In our recent case of Phillips v. State, 248 Ala. 510, 28 So.2d 542, 546, the witness Cox was allowed to testify as an expert. He was an undertaker with 25 years experience in that field and he had served as coroner of Etowah County for

over three years. The fact that he was coroner of the county did not qualify him to express an opinion as to the cause of death nor is an undertaker as such an expert on the question of the cause of death of a deceased. This court went on to say that it is not necessary that a witness be shown to be a practicing physician before he can express an opinion as to the cause of death. In Phillips v. State, supra, this Court approved the rule stated in Hicks v. State as follows:

> " 'The nature of a wound or injury, its probable cause and effect can be stated by expert medical witnesses, or witnesses shown to be familiar with such question; such as, an undertaker, or others showing competency.' In the Hicks case, supra (247 Ala. 439, 25 So. 2d [139] 140), it was held that a registered nurse was shown to be qualified to express an opinion, and in the case of Wilson v. State, 243 Ala. 1, 8 So. 2d 422, it was held that an interne who had no license or certificate from any State Board was competent to testify as to the cause of death."

See Payne v. State, 261 Ala. 397, 74 So.2d 630.

■ IV. It is argued that the court was in error in allowing the deposition of the witness, Miss Naomi Watts, to be introduced in evidence because she was present under subpoena by the plaintiff at the trial of the cause when her written deposition was offered in evidence. The same objection is made to the introduction in evidence of the written deposition of Miss Cassie Buckels, since she was a witness under subpoena by the plaintiff, present at the trial of the cause when her written deposition was offered in evidence. It is further insisted that the court was in error in permitting the plaintiff to introduce certain parts of the deposition of Mrs. Marvelle Fullerton when she was present under subpoena by the plaintiff at the trial of the cause. Later the entire deposition of Mrs. Marvelle Fullerton was introduced in evidence under the same circumstances.

Prior to the adoption of Act No. 375 [Acts 1955, Vol. II, p. 901 et seq., now §§ 474(1) through 474(18), Title 7, 1955 Cumulative Pocket Part, Code of 1940], there is no doubt that when a witness whose deposition has been taken, is personally present in court at the trial and is competent to testify, objection to the introduction of the deposition of the witness is well taken. Humes v. O'Bryan, 74 Ala. 64; Underwood v. Smith, 261 Ala. 181, 73 So.2d 717. It was shown in Ex parte Rice, 265 Ala. 454, 92 So.2d 16, that Act No. 375 is practically copied from certain provisions of the Federal Rules of Civil Procedure, 28 U.S.C.A. In Federal Practice and Procedure by Barron and Holtzoff, Vol. II, p. 374, in referring to the deposition of a witness under the present Federal rules, we find the following:

> "This provision makes it clear that the rules have not changed the long established principle that testimony by deposition is inferior to oral testimony and should be used as a substitute only if the witness is not available to testify in person. * * *."

We do not find that Act No. 375 on the point here under discussion makes any change from the law which was applicable in Alabama prior to the adoption of Act No. 375. Accordingly, the court was in error in allowing the depositions in evidence. Arnstein v. Porter, 2 Cir., 154 F.2d 464.

There are many other assignments of error in the record but in view of what has been said we do not feel that this opinion should be extended by a further discussion of these other assignments. These other matters may not be presented on another trial.

We conclude that the judgment of the lower court must be reversed and the cause remanded.

Reversed and remanded.

LAWSON, SIMPSON, GOODWYN and MERRILL, JJ., concur.