Willie Louise RIDDLESPERGER, Administratrix of the Estate of Douglas S. Riddlesperger, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 75–G–0134–S.

United States District Court, N. D. Alabama, S. D.

Jan. 14, 1976.

Steven D. Pugh, Birmingham, Ala., for plaintiff.

Wayman G. Sherrer, U. S. Atty., and Bill L. Barnett, Asst. U. S. Atty., Birmingham, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

By this action, Willie Louise Riddlesperger seeks damages against the United States (acting through the medical personnel of the Veterans Administration Hospital, operated by the United States, at Birmingham, Alabama), hereinafter referred to as Veterans Hospital, for malpractice, alleging that her husband's death was caused by the failure of medical personnel to use reasonable care and skill in diagnosing and treating her husband's condition and by the hospital's allegedly permitting her husband to fall from his bed. Her husband entered the hospital as a patient on May 7, 1973, for treatment and was pronounced dead on May 14, 1973, while still a patient therein.

## ISSUES INVOLVED

The complaint states that on May 7, 1973, the deceased, hereinafter referred to as "Riddlesperger," was admitted at the Veterans Hospital and suffered a misdiagnosis, and because of this was treated with improper care. This raises the following three issues:

(1) Whether treatment with anticoagulants should have been instituted upon formulation of a "working diagnosis;"

(2) Whether a brain scan was required prior to institution of a treatment program; and

(3) Whether there was negligence on the part of the hospital relating to or causing Riddlesperger's fall from his bed.

The essential facts of the case are as follows: Riddlesperger, age 56, was admitted to the Veterans Hospital on May 7, 1973. He complained of weakness on the right half of his body, difficulty

walking and using his right hand during the three days previous to admission, and falling to the floor on many occasions during this period. There was no history of convulsions, headaches, or vomiting. A lumbar puncture was performed which showed the spinal fluid to be clear and of normal pressure, though the protein count was 132 milligrams per cent, which was abnormal. Based upon this information, the attending physician formulated a working diagnosis of right hemiparesis, hereinafter referred to as "incomplete stroke," and prescribed treatment of anticoagulants (heparin, coumadin, and, to increase blood supply, rheomacrodex). Skull and chest X-rays were negative and the following tests were ordered: echoencephalogram, electroencephalogram and brain scan.

Riddlesperger was never placed in hard restraints after admission to the neurology ward on May 7, 1973, though the family requested them. The family was not permitted to stay with him outside the normal visiting hours. The evidence was that Riddlesperger was rational and cooperative when he entered the ward and this was considered sufficient reason not to use the restraints. He entered an eight-man ward and constant visitation was contraindicated due to his condition on admission, the fact that he showed improvement, and the size of the ward.

On May 8, 1973, he showed slight improvement of his motor powers. The electroencephalogram (hereinafter referred to as "EEG") was abnormal with a diffuse delta. It showed a left to right shift of two degrees but was found compatible with the working diagnosis. Improvement was noted on May 9, 1973, as "fairly good" and on the 10th as "very significant improvement," rating the use of the right hand as ⅘ and the right leg as ⅘. It was on the 10th that the echoencephalogram (hereinafter referred to as "echo") was interpreted to show a

4 millimeter shift from left to right of the midline of the brain. The attending physician considered the test results as inconsistent with the clinical findings of Riddlesperger's improvement.

On the morning of May 11, 1973, at 7:40 A.M., Riddlesperger raised up onto his knees in his bed, leaned out over his raised bedside rails and fell to the floor, striking his head on the bedside table, and causing a one-centimeter cut on the right of his forehead. A one-stitch suture closed the wound but almost immediately a neurological deficit was noted. At 11:00 A.M. a lumbar puncture was performed which revealed a bloody fluid. Riddlesperger, having been placed on respiratory assist, was transferred to an intensive care unit at 1:00 P.M., and an angiogram was scheduled shortly thereafter. The angiogram revealed a large malignant brain tumor (glioblastoma). His condition deteriorated until his death on May 14, 1973.

### THE GOVERNING LAW

■ The Federal Tort Claims Act [1] sets aside the sovereign immunity of the United States in cases where it is alleged, as in this case, that federal employees have tortiously caused personal injury. Thus, by the statute, the government's liability is the same as that of a private person under similar circumstances. The law of the state in which the negligent act occurs determines liability.[2] Briefly, the applicable Alabama law of malpractice is outlined as follows.

■ The standard of care required of hospitals in Alabama is one of "ordinary care" as defined in *South Highlands Infirmary v. Galloway*, 233 Ala. 276, 171 So. 250, 253 (1936):

" . . . that care which persons of common prudence exercise under like conditions . . . . This implies a care having regard to the conditions of the particular case, and to the fact

---

1. 28 U.S.C. § 1346.

2. 28 U.S.C. § 1346(b); *Rayonier, Inc. v. United States*, 352 U.S. 315, 318–320, 77 S.Ct. 374, 1

L.Ed.2d 354 (1957); *Fair v. United States*, 234 F.2d 288, 294–295 (5th Cir. 1956).

that the subjects of ministry are sick people. It implies an obligation to have such training and possess such skill as will enable the nurse to give reasonable and ordinary care to the patient. . . .

"It is not to be construed as imposing a greater 'degree of care, skill, and diligence' than that 'used by hospitals generally in that community' . . ."

In *Cooper v. Providence Hospital,* 272 Ala. 283, 130 So.2d 8 (1961), the plaintiff alleged negligence whereby the deceased was permitted to get up from his bed in the night and then fall to the floor, suffering injuries which resulted in his death. No evidence was shown that the hospital failed to exercise the required degree of care.

■ The standard is not broadened by the patient's illness where, as in *Mobile Infirmary v. Eberlein,* 270 Ala. 360, 119 So.2d 8 (1960), the patient was under psychiatric care; there the standard of care required was expressed in this manner at 270 Ala. 367, 119 So.2d 15:

"The care required of the hospital is not that care which persons of prudence exercise under like conditions, but that care which persons of common prudence, engaged in the hospital business, exercise under like conditions."

A hospital is not an insurer of its patients' safety.[3]

■■ The standard of care required of a physician in treating a patient is to possess and "to exercise such reasonable care, diligence, and skill as physicians . . . in the same general neighborhood, in the same general line of practice, ordinarily have and exercise in a like case." *Orange v. Shannon,* 284 Ala. 202, 206, 224 So.2d 236, 239 (1969). A physician is not an insurer of the successful issue of his treatment or service.[4]

■ It is clear that a physician is not liable for an honest mistake or error of judgment in making a diagnosis, or prescribing a mode of treatment, when the proper course is subject to reasonable doubt.[5] Evidence that an unfortunate result followed the prescribed treatment does not of itself show negligence.[6] The physician is not restricted to a particular method of care and treatment if more than one course is recognized by the profession in the same line of practice and in the same general neighborhood.[7] Further, a physician is not liable for an error of judgment in making a diagnosis, or in prescribing a mode of treatment, when the proper course is subject to reasonable doubt.[8]

The sufficiency of the evidence required in malpractice actions is well stated in *Waddell v. Jordan,* 293 Ala. 256, 260, 302 So.2d 74, 77 (1974), where the Alabama Supreme Court, quoting from *Orange v. Shannon,* 284 Ala. 202, 224 So.2d 236, 239 (1969), said:

" ' . . . [T]here must be something more than a mere possibility— something more than one possibility among others—that the negligence complained of was the cause of the injury. There must be some evidence to the effect that such negligence probably caused the injury. . . . ' "

■ Finally, damages are recoverable under the Alabama wrongful death statute.[9] The beneficiaries of such actions

---

3. *South Highlands Infirmary v. Galloway, supra.*

4. *Orange v. Shannon, supra; Sellers v. Noah,* 209 Ala. 103, 95 So. 167 (1923); *Woodlawn Infirmary v. Byers,* 216 Ala. 210, 112 So. 831 (1927); *Moore v. Smith,* 215 Ala. 592, 111 So. 918 (1927).

5. *Moore v. Smith, supra.*

6. *Moore v. Smith, supra; Parrish v. Spinks,* 284 Ala. 263, 224 So.2d 621 (1969).

7. *Sims v. Callahan,* 269 Ala. 216, 112 So.2d 776 (1959).

8. *Ingram v. Harris,* 244 Ala. 246, 13 So.2d 48 (1943).

9. *Code of Alabama of 1940, Recompiled 1958,* Title 7, Section 123.

are the heirs at law of the deceased, since the statute provides that the damages recovered are not subject to the payment of debts or liabilities of the intestate, but must be distributed according to the statute of distribution.[10]

▇ In actions where the administratrix sues, she must produce evidence that the heirs in whose behalf the suit is brought were receiving financial aid, or would have in the future, or else there is no pecuniary injury.[11] Though the Alabama statute provides only for punitive damages, Congress substituted actual or compensatory damages.[12]

Calculation of pecuniary loss is best defined in *Hoyt v. United States*, 286 F.2d 356 (5th Cir. 1961), where the court said that pecuniary damages do not include grief or loss of society or companionship; in *Hoyt* the court applied the standard of compensatory damages provided for in the Federal Employers' Liability Act as that Act was construed in *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 489, 36 S.Ct. 630, 631, 60 L.Ed. 1117 (1916):

> " . . . The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased."

## THE PROVEN FACTS

A working diagnosis of incomplete stroke was developed on May 7, 1973. Treatment immediately was prescribed with anticoagulants and continued until May 10, 1973. Plaintiff's expert, Dr. Walter R. Whitehurst, a well-qualified neurosurgeon, testified he would not have administered anticoagulants until he had made a complete diagnosis, which would have included results of a brain scan and an arteriogram, and that this would normally be required prior to the institution of formal treatment. He further stated that he treated cerebral vascular accident patients because there are not enough neurologists in the Birmingham area, and that as a neurosurgeon it is not his practice to use anticoagulant therapy.

Plaintiff also offered the testimony by deposition of Dr. William E. Doggett, III, who saw Riddlesperger from May 11, 1973, until May 14, 1973, at the intensive care unit. It was his testimony that the working diagnosis was well-founded because of the transient symptoms revealed in the history taken from the patient and the lab work of May 7, 1973. He further stated that all of the symptoms were compatible with a stroke, as were the results of the "echo" and "EEG," since a stroke can cause localized swelling as was indicated in the two tests.

Dr. Shin Oh, neurologist at the Veterans Hospital, testified that the working diagnosis formulated in Riddlesperger's case was proper with the history and data before the attending physician, who was under Dr. Oh's supervision in May of 1973. He further testified that there was no data brought forward prior to the fall on May 11, 1973, that was incompatible with the working diagnosis of incomplete stroke and the improvement Riddlesperger exhibited after admission and prior to his fall. Dr. Oh also testified that the immediate treatment with anticoagulants of a patient with the symptoms and test results of Riddlesperger would be used by approximately 50 per cent of the neurologists in the Birmingham community, as well as nationally.

Dr. James H. Halsey, noted neurologist, research worker in care and treatment of stroke victims, and professor at the University of Alabama Medical College, called by the United States, testified that the working diagnosis was properly made and that it was proper to

---

10. *Kuykendall v. Edmondson*, 205 Ala. 265, 87 So. 882 (1921); *Alabama Power Company v. Stogner*, 208 Ala. 666, 670, 95 So. 151 (1923).

11. *Heath v. United States*, 85 F.Supp. 196 (N.D.Ala.1949).
12. 28 U.S.C. § 2674.

administer anticoagulants upon the working diagnosis of incomplete stroke. In the absence of such treatment commencing immediately on incomplete stroke victims, the stroke would worsen in 30 to 50 per cent of the patients. While a patient with a tumor may evidence symptoms of an incomplete stroke, the incidence of such occurring is approximately one or two patients out of every 50. Thus, the incidence of incomplete stroke symptoms being exhibited by tumor patients runs two to four per cent.

With all candor, Dr. Halsey stated that early treatment with anticoagulants is a controversial area prior to arteriography being run on the patient, but that, nevertheless, the possibility of worsening the patient's condition (if there is an incorrect diagnosis) by administering anticoagulants is extremely slight compared with the very great benefits to those patients, correctly diagnosed, who are so treated.

■ The court is, therefore, of the opinion that the plaintiff has not surmounted her burden of proof in showing the United States guilty of any negligence in the misdiagnosis of Riddlesperger's condition.

■ Plaintiff elicited testimony from Dr. Whitehurst concerning the necessity of an early brain scan. The attending physician had ordered the scan but Riddlesperger fell on the 11th, prior to one being run, and the angiogram of the 11th precluded the necessity for it. The evidence was, however, that the test would not have been conclusive, since onset of the symptoms complained of occurred three days prior to admission and it would have been five days after symptoms occurred before the results were in had it been completed within the first 48 hours of admission. The evidence was that with that kind of delay between onset of symptoms and the test, the test would not usually differentiate between a stroke and a tumor. With the improvement in Riddlesperger's condition on the anticoagulants, the court finds that the judgment of the attending physician in not pursuing the brain scan, which may or may not have been any more helpful than was the EEG or the "echo" in a determinative diagnosis, was not proven to be negligence.

■ The family requested that restraints be placed on Riddlesperger and that they be allowed to stay with him. Hard restraints were not prescribed for Riddlesperger when he was admitted nor thereafter. The restraints were not prescribed on his first day of admission, when he was in his weakest condition, prior to the 11th, because he was cooperative, and they were not indicated during the next three days of improvement and continued cooperativeness; ultimately this is the attending physician's decision, and whether to grant the request of the family to sit with him obviously must be within the judgment of the attending physician. The court finds no negligence in the refusal of the requests.

■ While restraints would in all probability have prevented Riddlesperger's fall from his bed on the 11th, the evidence was that the bed rails were up and even the plaintiff's expert, Dr. Whitehurst, testified that there was "nothing much that you can do for them [patients] in bed, but sometimes you'd be tying a lot of people in bed that you needn't be tying in bed." There was other evidence that the use of restraints, unless needed to control a patient who is uncooperative and irrational, can cause a significant increase in the patient's anxiety and frustration, worsening his condition. The court finds that the decision of whether to use hard restraints is best left to the attending physician, and the plaintiff has failed to prove that there was any negligence in the fact that restraints were not used on Riddlesperger.

The court finds that in all probability Riddlesperger's death resulted from his unforeseeable fall from his bed on May 11, 1973, but that without this fall he would not have lived for more than six to 12 months, due to his terminal condition. Plaintiff has not shown the fall to be a result of any negligence on the part of the defendant, Veterans Hospital.

Had the court reached a different decision on any of the issues above, it would be necessary to consider damages. Though there is no negligence upon which to base an award of damages, the court finds that Riddlesperger was suffering from a terminal condition which was finally diagnosed as a malignant glioblastoma located in the posteroporietal area of the brain. Due to the rapid onset of symptoms and its size and the malignancy of the tumor, he could not have lived more than six to 12 months, and would never have been able to return to a productive livelihood. Thus it is the court's opinion that there could in no event be an award of compensatory damages if plaintiff had surmounted the burden of proving the alleged negligence of the Veterans Hospital because no pecuniary benefits would have accrued to anyone from his continued life.[13]

Judgment will be entered for the defendant.

**13.** *Hoyt v. United States, supra.*